Petition of SOCONY VACUUM TRANSP.
CO., Limited, and four other cases.

THE VOCO.

THE CHOAPA.

THE EMPIRE GARRICK.

THE BRITISH HARMONY.

Nos. A135–268, A138–213, A141–136.
A147–338, A152–9.

United States District Court,
S. D. New York.

April 7, 1950.

John W. Knox, and Macklin, Brown, Lenahan & Speer, New York City, by John W. Knox, Paul Speer, and Leo Hanan, New York City, for Socony Vacuum Transp. Co., Limited.

Bingham, Englar, Jones & Houston, New York City, by Richard F. Shaw, New York City, for Cargo Claimants Commodity Credit Corp.

Kirlin, Campbell, Hickox & Keating, New York City, by Robert S. Erskine and John F. Gerity, New York City, for Compania Sud-Americana de Vapores.

John F. X. McGohey, United States Attorney, New York City, by Max Taylor, Special Asst. to the Attorney General, for Leslie Bentley and United States as owner of the John P. Poe.

Reid, Cunningham & Freehill, New York City, by Herbert P. Reid, New York City, for British Tanker Co., Ltd.

BONDY, District Judge.

These five suits arise out of four collisions that took place during the existence of dense fog in the wartime swept channel approach to New York Harbor.

In the first proceeding, the Socony Vacuum Transportation Company, Ltd., as owner of the S. S. Voco, seeks exoneration from or limitation of liability. Claims for damage have been filed in this proceeding by the Compania Sud-Americana de Vapores, as charterer and bailee in possession of the S. S. Choapa; the Commodity Credit Corporation and others as owners of cargo on board The Choapa at the time she sank; Leslie Bentley, as master and bailee of the S. S. Empire Garrick; and the United States of America, as owner of the S. S. John P. Poe. The right of the owner of The Voco to limit liability is not disputed. The question remaining is its right to be exonerated.

The second proceeding is a petition by the Compania Sud-Americana de Vapores, charterer of The Choapa, for exoneration from or limitation of liability. Claims for damage have been filed on behalf of The Voco, Empire Garrick and John P. Poe. The issue before the court is whether the petitioner should be exonerated. Its right to limit liability is not disputed.

These two limitation proceedings are the result of collisions on the afternoon of September 21, 1944 between The Voco and Choapa, Empire Garrick and Choapa, and Empire Garrick and John P. Poe.

The third suit is by the charterer of The Choapa against the master of The Empire Garrick to recover for damage alleged to have been sustained as a result of the aforementioned collision between the two vessels.

The fourth and fifth suits arise out of a collision between The Choapa and another vessel on the evening of September 20th. At the time of collision the identity of that vessel was not known. Subsequently, however, information was received by the Compania Sud-Americana de Vapores tending to identify the unknown vessel as The British Harmony, owned by the British Tanker Company, Ltd. Thereupon the charterer of The Choapa filed a libel against the owner of The British Harmony, the fourth suit herein, for damage sustained by The Choapa in the collision on the evening of September 20th. The owner of The Harmony filed an answer admitting that The Harmony collided with another vessel that evening, but denying that the vessel was The Choapa. The fifth suit, a cross-libel by The Harmony against The Choapa, has been stayed by the injunction in The Choapa's limitation proceeding. It has been agreed, however, that the owner of The Harmony may file a claim in the limitation proceeding of The Choapa, nunc pro tunc, for the damage sustained by her if it be determined that she was in fact the vessel which collided with The Choapa on the evening of September 20th.

All the parties have consented to consolidate the several proceedings for the purpose of this trial. Nevertheless, whenever depositions introduced in evidence were taken

without opportunity of cross examination by any party to these proceedings, the court has not considered the testimony binding on such party.

The witnesses for The Choapa, a vessel with an overall length of 307 feet, breadth of 41.7 feet and depth of 18.9 feet, told the following story concerning the first of her three collisions: On the evening of September 20th, in a dense fog, The Choapa was proceeding fully laden into New York as part of a convoy consisting of a port column of seven ships and a starboard column of six. The Choapa was maintaining her position as the fifth ship in the port column. The master of The Choapa knew that there was a swept channel, marked by mid-channel buoys, in the approach to New York Harbor, but had not received any instructions as to the exact position of the buoys or the compass direction between them. For some time before the collision The Choapa proceeded at the convoy speed of 8 knots and followed the courses signalled from time to time by The Commodore, maintaining her position in the port column by the bearing of the signals of the vessels ahead, astern and to the starboard. Her master could not recall her precise compass heading at the time the vessel with which she subsequently collided was sighted. His recollection was that The Choapa's heading lay between 310 and 320 degrees true. Visibility was less than 1000 feet, and The Choapa was showing her navigating lights, sounding regulation fog signals and maintaining a proper lookout forward. Suddenly a fog blast was heard off The Choapa's starboard bow which seemed to come from a vessel other than one of the convoy units. The Choapa's engines were immediately stopped. As soon as the white masthead light of a vessel came into view close off the starboard bow, approximately 900 feet away, The Choapa's engines were put full speed astern and her rudder hard astarboard in an effort to avoid collision by a port to port passing. When the loom of the other ship was seen she appeared to be moving across the path of The Choapa at an angle of about 45 degrees and was too close to be avoided by The Choapa's starboard rudder, whereupon The Choapa

put her rudder hard aport in order to minimize the contact. By her prompt engine movements The Choapa's 8 knot headway had been largely reduced when the collision occurred at 7:53 P. M. The stem of the other vessel, identified at the time as a tanker, struck the starboard side of The Choapa abreast of No. 2 hold, scraped aft along the side to a point about abreast of the forward end of No. 4 hold, and struck and demolished The Choapa's starboard lifeboat, which was hung outboard as a wartime precaution. The tanker then disappeared along the starboard side off the stern of The Choapa into the fog. Following the collision, an investigation by the Chief Officer and First Engineer disclosed that the damage to The Choapa was not serious, and the Convoy Commodore was so advised by wireless. The Commodore thereupon instructed the master of The Choapa by radio to anchor well clear to starboard and to proceed at his discretion when visibility permitted. Thereafter, at 8:47 P. M., The Choapa dropped her anchor in compliance with the Commodore's instructions.

The witnesses for The British Harmony, a tank steamer with a gross tonnage of 8,452½, net tonnage of 4,896½, overall length of 482 feet and width of 61 feet, gave the following version of her collision: On September 20, 1944, The Harmony, fully laden and acting under Naval orders, took her departure from Gedney Buoy in New York Harbor at 3:30 P. M. Preceded by a convoy patrol vessel and followed by two merchant ships, she proceeded in single-column formation outbound through the swept channel, the middle of which was marked by buoys lettered I to A, located approximately three to four miles from each other. On account of the dense fog The Harmony proceeded at speeds varying between three and five knots and sounded regulation fog signals. Her Master, Chief Officer and Helmsman were on the bridge, and a lookout was stationed on the forecastle head. The Naval instructions received by The Harmony required her to pass all of the mid-channel buoys on her port hand, and these instructions were complied with except that Buoys I and D were passed close

to starboard. At 6:57 P. M., when in the vicinity of Buoy E, the navigation lights of The Harmony were turned on and her course was altered to 133 degrees true, which was the channel course between Buoys E and C. At this time The Harmony was maintaining a speed of 3 to 4 knots. When Buoy D was sighted at 7:30 very close by on her starboard hand, she altered her course 8 degrees to starboard in order to pick up Buoy C on her port side. At approximately 7:39 the whistle of a vessel sounding the signal "K-7" in Morse Code was heard ahead and interpreted by the Master of The Harmony to mean that the vessel sounding it was leading a convoy and proceeding at a speed of 7 knots. Shortly thereafter The Harmony sighted a vessel about 1000 feet on its starboard bow, heading on practically an opposite course, and the two ships passed each other starboard to starboard. Thereupon The Harmony immediately put her wheel hard astarboard and advanced her engines to full ahead. This speed was maintained for about a minute and a half for the purpose of facilitating quick rudder action and then reduced. Thereafter The Harmony, swinging around to a course of approximately 180 degrees true, crossed ahead of two other incoming vessels consecutively, in each instance advancing her engines to full ahead for about a minute or a minute and a half, and then reducing her speed to slow ahead. After these maneuvers she returned to her outbound channel course of 133 degrees true. At about 7:44½ P. M., upon hearing a fog whistle bearing approximately two points off her port bow, her engines were stopped. They remained stopped until 7:50, at which time a slow ahead order was given for the purpose of maintaining steerageway. That order, however, was countermanded by a full astern order about twenty seconds later when a white light with a green light underneath were observed bearing about four points on The Harmony's port bow. The vessel sighted to port continued across The Harmony's bow from port to starboard, bringing her starboard side lightly into contact with The Harmony's stem at 7:52, the angle of collision being between 80 and 90 degrees. At the time of impact The Har-

mony was "practically stopped" and starting to go astern. After the initial light impact the colliding vessel proceeded ahead, scraping her starboard side against The Harmony's stem for some distance before disappearing off The Harmony's starboard bow. While the two vessels were in contact, estimated to be twenty seconds, the Master and Chief Officer of The Harmony observed that the colliding vessel appeared gray with a white funnel, but subsequent efforts to communicate with the vessel and learn her identity were unsuccessful. Thereafter The Harmony dispatched an "S.O.S." message, giving notice of the collision, and, because the other ship did not appear to be damaged, resumed her outbound course of 133 degrees true, leaving Buoy C about four cables to port.

The Choapa has the burden of proving that the vessel with which she collided on the evening of September 20, 1944 was The Harmony. Neither The Choapa's witnesses nor those for The Harmony were able to identify the vessel with which they collided on that evening. The Master of Choapa was unable to offer proof of identification of the other vessel other than by describing her as a "tanker". Similarly, The Harmony's witnesses were unable to identify the ship with which their vessel collided, except that the Master and Chief Officer both testified that they concluded she was a British ship because her hull appeared to be painted gray and her funnel white, in accordance with the regulations of the British Ministry of War Transport for vessels trading in the North Atlantic at the time; whereas The Choapa's funnel and hull were painted dark gray. Nevertheless, the similarity of each side's testimony as to the time, place and manner of collision convinces the court that the vessel with which The Choapa collided on the evening of the 20th was The British Harmony.

The Harmony's log-books show that the collision took place between 7:51 and 7:52 P. M. and The Choapa's rough engine room log reports "a strong shaking" at 7:53. Although the deck log of The Choapa records the collision as occurring at 7:40, her Master testified that the notation in the rough

engine room log was more accurate because entries in the deck log were not made until some time after the events described therein.

Furthermore, the evidence indicates that both vessels were somewhere between Buoys E and C in the swept channel approach to New York Harbor at the time of their collision. Witnesses for The Harmony testified that she had passed Buoy D but had not yet sighted Buoy C when she encountered an inbound convoy and starboarded across its path. It does not appear that any of The Choapa's witnesses saw or heard any of the mid-channel buoys while proceeding inbound, and her Master admitted that he did not know whether he was in the swept channel at the time. Nevertheless, in view of the Master's testimony that he was on a course somewhere between 310 and 320 degrees true, and the fact that the up channel course between Buoys C and E was 313 degrees true, it is reasonable to infer that The Choapa's Commodore was leading his convoy through the swept channel betwen Buoys C and E when the collision took place.

Finally, the testimony of The Choapa's witnesses to the effect that the stem of the vessel with which she collided came into light contact with her starboard side abreast of No. 2 hold, scraped aft along her starboard side and damaged an out-rigged lifeboat strongly resembles The Harmony's description of the collision.

In view of the conclusion of the court that The Choapa has sustained her burden of proof on the issue of identity, it remains to determine where the fault lies for the collision.

On behalf of The Choapa it is contended that The Harmony was at fault for: (1) navigating on the wrong side of the swept channel in the waters of the inbound convoy; (2) altering her course to starboard and hauling across the path of the inbound convoy; and (3) failing to take immediate avoiding action upon sighting The Choapa. The Harmony, on the other hand, condemns The Choapa for: (1) proceeding at a rate of speed that was excessive in view of the dense fog; (2) maintaining an inefficient watch; and (3) navigating on the wrong side of the channel.

In seeking to establish that The Harmony was on the wrong side of the channel at the time of the collision, The Choapa relies heavily on testimony furnished by witnesses for The Harmony, since her own witnesses, not having been informed by the Commodore that the convoy was proceeding through the swept channel, did not have any knowledge of her position with respect to the mid-channel buoys. The Harmony, required by her Naval instructions to keep to the west of the buoys, was admittedly on the wrong side of the channel when she came down to the eastward of Buoy D. Her Master testified that after leaving Buoy E properly to port, he altered his course to 133 degrees true, the outbound channel course between Buoys E and C, and that he was still on that course when he passed Buoy D "very close" on his starboard hand. He admitted that he had not made any allowance for the possible effect of wind or current and suggested that a light westerly wind might have been responsible for The Harmony being out of position at Buoy D. The Chief Officer of The Harmony, who was on watch on the bridge, testified on direct examination that with the aid of field glasses he saw the letter "D" and trellis work of Buoy D only 50 to 100 feet away to starboard. If this testimony of the Chief Officer is to be believed, then, in view of the subsequent maneuvers of The Harmony (altering her course 8 degrees to starboard, maintaining it for about 9 minutes at a speed of 3 or 4 knots, and then putting her helm hard astarboard), not only was The Harmony on the proper side of the channel at the time of the collision, but also when she sighted the first vessel in the incoming convoy.

However, the Chief Officer's story is discredited by his testimony on cross-examination that after steering a course of 8 degrees to starboard for 9 minutes after passing Buoy D, The Harmony was on the line of the buoys. Taking an average speed of 3½ knots for the 9 minute period, her 8 degree alteration in course would have carried The Harmony over 400 feet lateral-

ly from her position abeam of Buoy D. Therefore, if The Harmony passed only 50 to 100 feet to the eastward of Buoy D, at the end of 9 minutes she would have been approximately 300 to 350 feet to the westward of mid-channel and not merely on the line of the buoys. This inconsistency in the two estimates by the Chief Officer casts grave doubt on the reliability of either, a doubt not dispelled by the testimony of The Harmony's Master, who at first admitted that he was still on the wrong side of the channel when he passed the first vessel of the incoming convoy, but then changed his mind and testified that by that time he was just at mid-channel. It seems clear that neither the Master nor the Chief Officer had any means of knowing with certainty where their vessel was with respect to the middle of the channel. Since there is no evidence, and no reason to suppose, that the convoy was being led up the westerly side of the channel, the likelihood is that The Harmony passed Buoy D considerably further to the eastward than estimated by her witnesses and that she was still in easterly waters when she encountered the convoy.

■ Under these circumstances, the navigators of The Harmony must be held at fault for altering her course to starboard after passing the first vessel in the convoy starboard to starboard and hauling across the path of the convoy. Cf. United States v. Valldemosa S. S. Co., (The Valldemosa), 2 Cir., 162 F.2d 759; Alcoa Steamship Co. v. The Sovac (Socony Vacuum Transportation Co.), 1946 A.M.C. 811. The Master of The Harmony admitted that his hard right rudder action put him athwart the course of the convoy, but stated "I preferred to do what I did rather than run down the middle of the two columns (if there were two columns) of this convoy," and "given a little speed, I intended crossing astern of the first ship and ahead of the second ship—and then I would have been well clear of this convoy." This explanation hardly absolves The Harmony in view of the fact that her predicament was the result of her own negligence in navigating on the east side of the channel.

■ In order to avoid liability The Harmony has the burden of proving that her negligence in this respect was not a cause of the collision. See Southern Pac. Co v. U. S., 2 Cir., 72 F.2d 212, 214; Tidewater Associated Oil Co. v. U. S., D.C., 60 F.Supp. 376, 381–382. In this connection her Master and Chief Officer testified that before The Choapa was sighted The Harmony had reached the west side of the channel and had swung back to the channel course of 133 degrees true. However, in view of the testimony that the collision occurred at an angle of between 45 and 90 degrees, it is highly improbable that The Harmony was on a course of 133 degrees true when The Choapa was sighted, since that would mean that The Choapa was proceeding approximately 45 to 90 degrees to the west of the up channel course and heading toward the New Jersey shore.

In a brief on behalf of The Harmony it is suggested that The Choapa's Master was navigating by following the fog blasts of the vessel ahead, rather than by steering an exact compass course; that, mistaking the fog blast of The Harmony for that of the vessel ahead, he directed his course toward the British vessel; and that this "would account not only for The Choapa being out of her column line and far over toward the west side of the swept channel, but would also, in conjunction with the hard-over port helm order executed by The Choapa shortly prior to the collision, account for the wide-open collision angle."

This explanation, based on pure speculation, is refuted by the evidence and the reasonable inferences to be drawn therefrom. The Choapa's Master testified that he at all times followed the courses ordered by the Convoy Commodore and that when he sighted The Harmony he was proceeding on a course somewhere between 310 and 320 degrees true. Although he could not remember the precise course, his recollection of it being between 310 and 320 true is consistent with the fact that the course for inbound vessels between Buoys D and C was 313 degrees true. The Master's testimony that he kept his position by listening to the blasts of the ships ahead, astern and to the starboard of him re-

726

ferred to maintaining his position in relation to the other vessels in the convoy, and is entirely consonant with his testimony that he was steering the course ordered by his Commodore. Moreover, it does not seem plausible to attribute the wide-open collision angle to the hard left helm action taken by the Choapa shortly before the collision in view of the very brief space of time between such action and the collision and the likelihood that any swing to the left would have been counterbalanced by the hard right rudder action which immediately preceded it.

■ The Harmony's Master testified that in hauling across the path of the convoy he swung around to 180 degrees true. This intersected the channel course at an angle of 47 degrees. In view of the testimony concerning the angle at which the collision occurred, and the testimony of The Choapa's Master that when he sighted the red and white lights of The Harmony off his starboard bow the ship "seemed to be headed in a generally southerly direction," it is likely that The Harmony was still on a course of 180 degrees true and angling across the path of the convoy when she heard the fog signals of The Choapa and stopped her engines, and that she did not reach the west side of the channel and resume her course of 133 degrees true before the collision. Since it appears that the collision with The Choapa was a direct consequence of The Harmony's negligent navigation on the wrong side of the channel in violation of her Naval instructions and her wrongful alteration of course putting her athwart the path of the convoy, The Harmony must be held liable.

■ Although the question as to whether The Harmony took prompt avoiding action on sighting The Choapa is not entirely free from doubt, the court is not persuaded that she was at fault in this respect. It is not disputed that The Harmony stopped her engines at 7:44½ P.M. upon hearing the whistle of another vessel on her port bow, and that they remained stopped for approximately six minutes. Her Master testified that about twenty seconds after the engines were ordered slow ahead at 7:50 to maintain steerageway he sighted the lights of a ship four points on his port bow and immediately ordered full speed astern. He further testified that the slow ahead order was never carried out, and this was corroborated by the Fifth Engineer. The Choapa contends that the following entries in The Harmony's rough engine room log indicate that her engines were not reversed as promptly as her Master testified:

| Slow Ahd | 7.50 |
| Bump | 7.51 3/4 |
| Full Ast | 7.51 Bump |

The Fifth Engineer testified that he made all of the above entries personally except that he did not know who wrote "Bump" after "Full Ast 7.51". He further testified that the engines had started to move full astern before the bump, but that before he entered the movement in the logbook he felt the bump and immediately recorded it in compliance with orders received from the Second Engineer. This explanation of the peculiar sequence of the log entries is not so unreasonable as to justify a finding that The Harmony's Master, who had been on the alert for several minutes because of the presence of the convoy, failed to order his engines full astern as soon as he sighted the lights of The Choapa.

It remains to consider whether The Choapa is also to be held liable for the collision.

■ The contention that The Choapa was proceeding on the wrong side of the channel was necessarily rejected when the court found that The Harmony did not succeed in getting back into westerly waters before the collision. However, even if it had been established that The Choapa was navigating up the westerly side of the channel she would not be at fault if such navigation were the result of following her convoy instructions, see The Madiana, D.C., 63 F.Supp. 948, 951; Adrastus-George Westinghouse, D.C., 88 F.Supp. 436, 1949 A.M.C. 773, 777, and the case is devoid of any evidence that The Choapa failed to comply with the orders of the Convoy Commodore.

This also disposes of the contention that The Choapa should be held liable for traveling at an excessive rate of speed in a dense fog, since the convoy was directed to proceed at 8 knots and The Choapa was merely carrying out the orders of the Commodore. The Madiana, supra.

■ Finally, it is contended that The Choapa was guilty of maintaining an inefficient lookout in that she did not hear The Harmony's fog signals until one minute before the collision. This contention is based on entries contained in The Choapa's engine room log which show that only a minute elapsed between the time her engines were stopped and the collision. The Master of The Choapa, on the other hand, testified that he thought the interval was "nearer to two minutes," and this finds some support in the testimony of The Harmony's Master that The Choapa's speed was "very slow" when the vessels collided. However, even if the stop order preceded the collision by only a minute, The Choapa can not be charged with a defective lockout. In view of The Choapa's position in the convoy as the fifth vessel in the port column, it would be unreasonable to expect her lookout to be able to single out The Harmony's whistle from the fog blasts of the other vessels ahead and to the starboard until The Harmony had cut across the starboard column of the convoy and drawn dangerously close. This is borne out by the testimony of The Choapa's Master that he stopped her engines when he heard "a blast which came from a ship which sounded * * * nearer than the other ships in the column, and which seemed to come from the starboard off the bow." It is immaterial that The Harmony heard a whistle off her port bow and stopped her engines 7 or 8 minutes before the collision, since The Harmony, knowing that she was hauling across the path of an incoming convoy, would naturally stop upon hearing any fog signal on her port bow.

■ Nor can The Choapa be blamed for her rudder action upon sighting The Harmony's lights. If The Choapa's Master erred in first starboarding and then porting, it was solely an error of judgment caused by an emergency not of his own making, and not actionable negligence. See The Vanity, 79 Ll.L.R. 594, 599.

■ It follows, therefore, that The Harmony must be held solely at fault for her collision with The Choapa on the evening of September 20th.

According to The Choapa, following her collision with The Harmony, and while at anchor during the night of September 20th–21st, her crew shifted some of the cargo in No. 2 hold and made temporary repairs to the area damaged by The Harmony. There was some leakage into the starboard bilge of Nos. 2 and 3 holds through a cracked plate and some displaced rivets, wetting a few bags of sugar which were stowed next to the damaged area, but the leakage was at all times controlled by The Choapa's pumps and never rose higher than 18 inches in the three-foot bilge. At about 4:15 A.M. on September 21st, The Choapa weighed anchor and proceeded northward for about fifteen minutes, when the dense fog required her to reanchor. She got under way again at about 10:55 A.M. and, guiding herself by the radio bearing of Ambrose Lightship, moved cautiously in a northerly direction. While proceeding in this manner, a bell buoy was heard and sighted off her port bow, which the Master of The Choapa identified as having the letter "F" painted on it. Because fog signals were heard at this time from what seemed to be an outbound convoy and the visibility was not good, he decided that the safest thing to do was "to pull over and anchor." He therefore hauled over to a point which he estimated to be about a half mile above Buoy F and 900 to 1200 feet in a sidewise direction to the eastward of it and anchored. Immediately thereafter The Choapa displayed in her forerigging a black ball, the regulation daylight signal for a vessel at anchor, and hoisted two additional "shapes" above her bridge as an extra precaution. She also began sounding regulation fog bells, both fore and aft, one bell alternating with the other. When The Choapa first anchored above Buoy F she lay heading about 350 degrees to the northward. Later,

a shift in the wind to southwesterly caused her to swing on her anchor and head in that direction. At about 3:00 P.M. the bow of The Voco was sighted looming out of the fog and heading approximately at a right angle for the starboard side of The Choapa. The Choapa's fog bells, which up to that time had been sounded alternately, were then rung continuously, and her Master, noticing that The Voco was not changing her course, ordered full speed ahead in an effort to pull clear. The Choapa succeeded in moving only 70 or 80 feet before The Voco crashed into her starboard side at the forward end of No. 4 hold at an angle of nearly 90 degrees. The force of the impact was such that it caused The Choapa to roll 15 to 20 degrees to port and broke some steam connections in the engine room, flooding the engine and boiler rooms with live steam and making it impossible for the crew to remain there and keep up steam or operate the pumps. About a minute after The Voco collision, and while The Choapa's fog bells were still being sounded continuously, The Empire Garrick loomed out of the fog off The Voco's starboard side, crossed The Choapa's bow, and in so doing, sideswiped the stem of The Choapa with her port side. Soundings taken of The Choapa's after holds a few minutes later disclosed that they contained about four or five feet of water. After learning that the water in these holds was rising rapidly and that the steam from the engine room prevented the crew from operating the pumps in the stern part of the ship, The Choapa's Master ordered her abandonment. All of her personnel thereupon were transferred safely to The Voco, which was standing by. At about 5:00 P. M. The Choapa sank stern first.

The Voco, a steam tanker of about 5,090 gross tons with an overall length of 410 feet, breadth of 53½ feet and depth of 29 feet, was one of forty vessels in and about New York Harbor on September 20, 1944 composing a convoy that was to sail for European ports the following day. On September 20, the Masters of these vessels attended a convoy conference at the Office of the Port Director in New York, where they received oral and written instructions.

According to these instructions, they were to proceed by way of Ambrose Channel in single-column formation to Gedney Buoy, and then in two-column formation (The Voco being assigned to the port column) down a swept channel 600 yards wide and marked by mid-channel buoys identified by letters from Buoy I at the northerly end to Buoy A, approximately 28 miles away, at the southerly end. The members of the convoy were instructed to steer courses of 154 degrees true from Gedney Buoy to Buoy I, 161½ degrees true from Buoy I to Buoy E, 133 degrees true from Buoy E to Buoy C, and 121 degrees true from Buoy C to Buoy A. The ships in the port column were instructed to pass all mid-channel buoys "reasonably close aboard" to port, and those in the starboard column to maintain a distance of not more than 225 feet from the track of the vessels in the port column. All vessels were to proceed at a speed of 10 knots from Gedney until arrival on "station", that is, until they were in proper position relative to the guide ship, at which time they were to reduce their speed to 6 knots. The instructions also provided that if any vessel should be delayed in getting under way or at any point during departure, it should "make every effort within limits of safe navigation to take proper station as soon as possible."

The Voco's story concerning her collision with The Choapa and the events leading up thereto was as follows: On September 21, 1944 The Voco had proceeded outbound in single-column formation as far as Gedney Buoy, which was passed at 1:20 P. M., when she stopped her engines in order to make some minor engineroom repairs. With her engines stopped, but still under headway, The Voco proceeded between a quarter and a half mile to the eastward and seaward of Gedney Buoy so as to be out of the way of the vessels of the convoy astern of her, and in compliance with her written convoy orders to use the temporary anchorages to the eastward of Gedney in case of emergency. Upon completion of her repairs at 1:30 P. M. The Voco got under way again and started the sea passage with her engines operating so as to produce a speed of approximately 9¼ knots. Heavy fog

having been encountered, The Voco was blowing regulation fog signals and trailing a fog-buoy. Her Master and Second Officer were on the bridge, and lookouts were stationed forward, on top of the wheel house and at the stern. In proceeding from her position off Gedney Buoy The Voco assumed a course of 154½ degrees true, thereby avoiding crossing in front of any of the other vessels in the convoy that were navigating through the swept channel in the dense fog. At 1:43 P. M., when it was estimated that Buoy I was off her starboard beam, The Voco altered her course to 161 degrees true. This was maintained until about 2:06, when Buoy H was heard off the starboard beam. The Voco thereupon changed her course to 169 degrees true. A minute later Buoy H was observed about two cables off the starboard quarter. A short time after passing Buoy H the fog lifted somewhat and The Voco sighted a ship about a half mile ahead, and shortly thereafter she observed another vessel fairly close on her starboard quarter proceeding at the same speed as The Voco and bearing into her. In order to maintain a safe distance between herself and the latter vessel, The Voco at 2:14 altered her course to 165 degrees true. At the same time she increased her speed to 9¾ knots so as to draw a safe distance ahead. When it was observed that the ship off the starboard quarter was still merging into The Voco, the latter made another alteration of course to the east and assumed a course of 162 degrees true at 2:20 P.M. After proceeding on this course for about five minutes, the bell of Buoy G was heard ahead off to the starboard, whereupon The Voco's course was altered to 164 degrees true, and at 2:28 Buoy G was passed close to starboard. The Voco continued on this course until 2:50, when she sighted the stern section of The Choapa ahead off her port bow at a distance of approximately 1500 feet. When first sighted The Choapa was at a right angle to the course of The Voco, showing her starboard side, and appeared to be crossing the channel with some headway on her. The Voco's wheel was immediately put hard aport and her engines reduced to slow ahead in an effort to avoid collision by passing under The Choapa's stern. About a minute later, however, The Voco observed two black balls and an anchor ball on The Choapa. The Voco's engines were then immediately put full speed astern. By this time The Voco had swung three degrees to her left under her port helm, but her full astern movement checked this swing and caused The Voco to come back to the right, so that she was heading approximately 164 degrees true at about 2:53, when the two vessels collided at an angle of 90 degrees. At the time of the collision The Voco had a headway of approximately two knots and the contact between the vessels was comparatively light. Immediately after the impact the reverse movement of The Voco's engines backed her away from The Choapa. At the request of The Choapa, however, The Voco went ahead again and put her stem up against the starboard side of The Choapa. Shortly thereafter The Voco's stern lookout reported the approach of a vessel astern, and The Voco's Master observed The Empire Garrick about a point on the starboard quarter at a distance of about two or two and one half cables heading straight for The Voco's bridge. The Voco immediately went full astern, pulling clear of The Choapa. The Garrick, proceeding at considerable speed, started to swing off to starboard, and her port side forward struck the starboard bow of The Choapa a heavy blow. Immediately after this collision the crew of The Choapa began abandoning ship and were taken on board The Voco, which returned with them to New York after The Choapa sank stern first at about 5:00 P.M. The damage sustained by The Voco as a result of the collision was very slight and confined to her stem.

The Empire Garrick, a steam tanker of about 7000 gross tons with an overall length of 483 feet and width of 59½ feet, was also part of the convoy which departed from New York Harbor on September 21, 1944. According to the Garrick, her collisions with The Choapa and The John P. Poe that afternoon occurred in the following manner: After dropping her pilot The Garrick proceeded down the swept channel at a speed of approximately 9½

knots in the port line of two staggered columns. She had a look-out posted on the forecastle head, a deck watch consisting of her Master, Second Mate, Helmsman and a Cadet, and sounded regulation fog signals whenever the fog closed in. According to her Master, she passed Buoys I, H and G on her port hand and was approaching Buoy F when he heard a backing signal of three short blasts coming from a point fine on the port bow. The Garrick immediately stopped her engines and went full speed astern at 2:57 P.M., sounding three short blasts. Almost immediately thereafter the forecastle lookout reported two ships ahead, which were observed by those on the bridge practically simultaniously about 1000 feet away. Upon sighting these vessels, which proved to be The Choapa and Voco and which were in collision at the time, The Garrick's helm was put hard astarboard. The Choapa's bow was pointing in a westerly direction and her starboard side was practically beam on to The Garrick. The Voco was on The Garrick's port bow, nearly stern on to The Garrick, showing her starboard side slightly. As a result of her engine and rudder action The Garrick swung off to starboard, but not sufficiently to avoid collision, and at 2:58 her port side just forward of the bridge struck the stem of The Choapa a glancing blow and scraped past at an angle of 70 to 80 degrees. The Garrick's Master estimated that her speed had been reduced to 7 or 8 knots when the collision occurred. The Garrick maintained her hard right rudder for about a minute until she had cleared The Choapa, and then put her wheel at amidships, but kept her engines working full astern until she had lost her headway. After her collision with The Choapa The Garrick blew two long blasts for a ship underway but stopped in the water, and was about to anchor when The John P. Poe came into sight over two ship lengths away approaching The Garrick's starboard side. Thereafter, at 3:03 P.M., the flare of The Poe's port bow, about in line with her No. 1 hatch, struck the starboard side of The Garrick abreast of her foremast at an angle

of about 70 degrees. The Garrick then returned to New York for repairs.

The John P. Poe, a Liberty type vessel of 7,191 gross tons, 4,389 net tons, with a length of 441 feet, breadth of 57 feet and depth of 37 feet, was also a member of the convoy leaving New York Harbor on September 21, 1944 bound for European ports. According to The Poe, after leaving Gedney Buoy at 1:30 that afternoon she assumed her assigned position in the starboard column of the convoy and started down the swept channel. Her Master, Second Mate, Helmsman and a Naval Gunner were on the bridge, two Naval Gunners were on the forward gun platform and a lookout was stationed on the bow. At 1:54 P.M. Buoy I was heard and passed 400 to 600 feet off The Poe's port side. Thereafter, the bell from Buoy G was heard (Buoy H neither having been seen nor heard) and at 2:40 was passed at about the same distance off her port side as Buoy I. At the time The Poe was proceeding at a speed of approximately 7½ knots and blowing fog signals of about five seconds duration every minute. After passing Buoy G The Poe heard a number of different whistles, including a danger signal, which seemed to come from three or four ships well off the port side and clear of The Poe. The vessels were not seen at the time, but a few minutes later, at 2:58, the shadow of The Empire Garrick was observed about one or two ship lengths ahead, moving across the channel at an angle of 45 to 50 degrees with very slight headway on her. The Poe immediately stopped her engines, went full speed astern and put her rudder hard astarboard, but was unable to avoid collision, her port bow striking the starboard bow of The Garrick at about an angle of 22 degrees at 3:00 P.M. Thereafter The Poe, unable to contact The Garrick because of the dense fog, returned to New York for repairs.

One of the most vigorously contested issues at the trial was whether the collision between The Voco and Choapa occurred on the west or east side of the swept channel. Determination of this issue is made

difficult in view of a sharp conflict in the evidence.

The Choapa's Master testified that he anchored about a half mile north of Buoy F and 900 to 1200 feet eastward of it. Although there is ample support in the evidence that the collision occurred approximately a half mile above Buoy F, The Voco strongly disputes the assertion that The Choapa anchored to the east of mid-channel. Both the Master and Chief Officer of The Voco testified that when they observed The Choapa in relation to Buoy F shortly after the collision, she was lying slightly to the westward of the middle of the channel. The Voco, admitting that she was on the easterly side of the channel when she came down past Buoys I, H and G, nevertheless contends that her gyro compass record proves that she crossed over into westerly waters shortly after passing Buoy G and before sighting The Choapa. In support of this contention counsel for The Voco have prepared a diagram, purporting to show her navigation from the time she left Gedney Buoy until her collision with The Choapa, based on the various compass headings disclosed by The Voco's gyro compass record. Any plotting of this record requires a point of departure. The point chosen in this instance has a bearing of 125 degrees true from Gedney Buoy and is a half mile away. The distance is based on the testimony of The Voco's Master that after he stopped for engine repairs off Gedney Buoy at 1:20 P.M. he drifted about a quarter or half mile to the eastward during the next ten minutes before getting under way again, and the bearing is derived from a reading of The Voco's gyro compass headings between 1:20 and 1:30. Given this starting point, it follows from a plotting of the gyro compass record that The Voco was approximately 600 feet to the west of mid-channel at the time of her collision with The Choapa. On the other hand, counsel for The Choapa have prepared a diagram in all respects identical with that submitted on behalf of the Voco except that The Voco is given a point of departure of a half mile due east of Gedney Buoy. The result is that The Voco winds up approximately the same distance (i. e., 600 feet) to the east of the middle of the channel at the point of collision.

The obvious difficulty with these diagrams is the uncertainty surrounding The Voco's precise point of departure off Gedney Buoy. The bearing of 125 degrees true presupposes that when The Voco stopped her engines at 1:20 P.M. she was right alongside Gedney. However, the record is devoid of any evidence on the question how close The Voco actually passed Gedney, and if this occurred some distance to the eastward it would throw off the starting point assumed in The Voco's diagram and might materially change the ultimate result. At the same time, however, the compass headings shown by the gyro recorder between 1:20 and 1:30 seem to refute The Choapa's assumption that The Voco started from a point due east of Gedney. Of course, these headings by no means preclude the possibility that The Voco started at some point below Gedney and a half mile to the eastward of the middle of the channel, but they do indicate why the result reached in The Choapa's diagram can not be regarded as dispositive.

The Voco's deck bell book contains an entry to the effect that Buoy H was left two cables off The Voco's starboard quarter, and her Master testified that on the basis of his observation of Buoy H from a position off his starboard quarter he estimated that he had passed the buoy about two cables off his starboard beam. However, The Voco's Master conceded that he was "just guessing" at this distance, and it would seem that his guess was on the conservative side if for no other reason than the fact that a plotting of The Voco's gyro compass shows that The Voco would have picked up Buoy G two or three hundred feet on her port hand if she had actually passed Buoy H only two cables east of mid-channel. However, it is undisputed that The Voco left Buoy G on her starboard hand. In this connection her Master testified that he passed 50 or 60 feet to the eastward of Buoy G, while her Second Officer estimated the distance at "less than a cable." Even so, if either of these latter estimates were reliable the

court would conclude that The Voco was on the westerly side of the channel when she collided with The Choapa. However, the wide variation between the estimates of the Master and Second Officer is indicative of the unreliability of any estimate of distance made in a dense fog, a fact that was appreciated by the Second Officer when he admitted that it was very difficult to say with any certainty how far off Buoys H and G were when The Voco passed them. Moreover, the court's suspicions are aroused because the word "close" in The Voco's bell book entry noting the passing of Buoy G close off the starboard quarter appears to have been written over an erasure, or at any rate with a different pencil than that used in writing the remainder of the entry or succeeding entries. The court is therefore unable to conclude from The Voco's gyro compass record that she succeeded in reaching the west side of the channel before her collision with The Choapa.

Equally inconclusive are the diagrams prepared by counsel for The Voco and Choapa on the basis of a bearing taken of Buoy F by The Empire Garrick while at anchor after her collisions with The Choapa and Poe. This bearing, entered in The Garrick's logbook, fixed Buoy F 101 degrees true at an estimated distance of three cables from The Garrick's anchorage. The Garrick's Master testified that while lying at that anchorage he caught sight of The Choapa before she sank, and although he failed to take a bearing of The Choapa's position, he estimated that she lay one half to three quarters of a mile to the north and to the east of The Garrick. Because of the indefiniteness of this testimony with respect to The Choapa's bearing from The Garrick's anchorage position, it is impossible to ascertain from it The Choapa's location in the channel with any degree of certainty. Indeed, the diagrams submitted by counsel, showing The Choapa on different sides of the channel, clearly demonstrate the futility of attempting to fix The Choapa's position on the basis of the general observations of The Garrick's Master.

More helpful are the diagrams submitted by counsel which are concerned with fixing the spot where The Choapa sank, for it is not disputed that The Choapa was still lying at anchor when she finally went down. According to The Voco's Second Officer, The Voco dropped a temporary marker buoy "over the position where The Choapa sank," and The Voco's bell book contains the following entry: "5.08 launched marker buoy bearing 180 degrees compass 5 cables F buoy." The Vocos' Master first testified that the marker buoy was dropped about a cable length to the northward of the place where he observed bubbling and discolored water after The Choapa went down, but changed his story in this respect when he subsequently testified that The Choapa was on the bottom where the marker buoy was dropped, thereby substantiating the story of the Second Officer. The Voco's Master also admitted that the word "compass" in the bell book entry indicated an exact bearing and not merely an estimate. Counsel for The Choapa concede that a plotting of the marker buoy bearing 180 degrees from Buoy F would show that The Choapa sank on the westerly side of the channel, but urge that since this literal reading of the entry would mean that the collision occurred south of Buoy F, when it is undisputed that it occurred north of the buoy, the entry should be read as if the bearing were 360 degrees. This is obviously the only sensible interpretation of the entry, a conclusion which is fortified by the admission of The Voco's Master that the entry meant that Buoy F bore 180 degrees from the marker buoy, and not vice versa. However, there is considerable uncertainty as to whether the bearing was taken over The Voco's gyro or magnetic compass. If the gyro compass was used, it would mean that The Choapa went down in the neighborhood of 900 feet to the east of midchannel, thereby corroborating the testimony of The Choapa's Master. On the other hand, if the bearing was magnetic, determination of The Choapa's position is made difficult because the exact deviation of The Voco's standard compass is not

known. In this connection, however, her Master testified that the deviation was between zero and five degrees, and that two degrees was usual. Assuming a deviation of two degrees west in accordance with the suggestion of The Voco's Master, it follows that the marker buoy was dropped approximately 250 feet east of the middle of the chanel.[1] The Choapa argues that every other compass heading mentioned in the testimony for The Voco was given by gyro compass and that in view of the failure of The Voco to produce the man who entered the bearing in her bell book, The Choapa is entitled to interpret the entry most favorably to her case. It is unnecessary, however, to resolve the question of which compass was used to take the bearing, since in either event the court is not satisfied that The Voco had reached the westerly side of the channel when she crashed into The Choapa's starboard side at the forward end of No. 4 hold.[2]

The Voco's Master attempted to justify his navigation down the easterly side of the channel on the ground that he had been informed orally at the convoy conference that the swept channel would be clear of all traffic except for the vessels proceeding in the outbound convoy. However, The Garrick's Master, who attended the same conference, testified that he understood this to mean that only the westward portion of the channel would be kept clear. Indeed, the reason advanced by him for failing to anchor on the east side of the channel after his collision with The Choapa was that he did not know that side would be clear. In any event, upon interrogation by the court, The Voco's Master admitted that what he had heard at the conference about the channel being clear did not entitle him to ignore his written instructions to proceed down the west side of the channel. The court appreciates the

awkward position The Voco's Master found himself in after he had completed his repairs off Gedney Buoy and was confronted with the problem of getting over to the proper side of the channel without endangering his own vessel or other units of the convoy. But it is difficult to understand why he waited until he heard Buoy H off his starboard beam before making any attempt to merge with the port column of the convoy. Had he begun to shape his course slightly to the west of the channel course sooner, instead of maintaining a course parallel to that of the channel from Gedney to Buoy H, The Voco in all probability would have reached the west side of the channel above the point of collision and collision would have been averted.

██ ██ In any event, the navigation of The Voco's Master was faulty because in attempting to merge gradually from Buoy H with the port column of the convoy he proceeded at an excessive rate of speed. The masters of the various vessels composing the convoy were orally instructed to maintain convoy speed irrespective of fog or weather conditions, but this must be interpreted in the light of further instructions that if any vessel were delayed it should make every effort to take its proper station as soon as possible "within limits of safe navigation." In other words, although each vessel was to maintain convoy speed once in convoy formation, if a vessel were delayed in reaching her position in the convoy her speed in attempting to join it was to be in conformity with the established rules of prudent navigation. While The Voco's Master may have had the safety of the other convoy units in mind after leaving Gedney Buoy, he was unmindful of the safety of any vessels proceeding inbound or lying at anchor in the easterly waters of the channel at the time. If safety dictated that he avoid

1. Indeed, even if a deviation of five degrees west were assumed, the buoy would still have been dropped on the east side of the channel by a matter of 90 feet.

2. The court has taken into consideration the testimony of The Voco's Master that the marker buoy indicated where the center of The Choapa lay at the bottom, since it was dropped over the spot where bubbles were observed rising from the sunken vessel. The Master also testified that after The Choapa's decks were awash she tipped up to a nearly vertical position and went down very quickly stern first. This would indicate that she probably did very little sliding to the eastward in sinking to the bottom.

any sharp alteration of course to the west across the path of the port column of the outgoing convoy, it also required him to proceed down the easterly side of the channel at a rate of speed that was reasonable under existing conditions of visibility. No citation of authority is required to support the proposition that a speed of 9¾ knots is excessive in conditions of dense fog and that a vessel guilty of proceeding at such a speed will be held liable for any collision resulting therefrom. There is no question that the speed of The Voco was a prime cause of her collision with The Choapa, for The Voco's Master admitted that if he had been proceeding at 5 to 7 knots when he sighted The Choapa he could have completely avoided the collision. Since The Voco's convoy orders did not justify her in maintaining a speed of 9¾ knots while proceeding down the easterly side of the channel, but on the contrary, cautioned against such navigation, The Voco must be held at fault for her collision with The Choapa.

■ As an independent ground for imposing liability on The Voco it is asserted that her Master was guilty of gross negligence in failing to reverse his engines as soon as he saw The Choapa lying athwart his path. On first sighting The Choapa The Voco's engines were reduced to slow ahead and her wheel put hard aport, and it was not until The Choapa's anchor ball was observed a minute later that The Voco's engines were ordered full astern. However, when The Choapa was first seen by those on board The Voco she appeared to be proceeding across The Voco's bow from port to starboard with some headway on her, and The Voco's Master reckoned that by reducing his engines to slow ahead he would get the maximum effect out of his hard left rudder and pass under The Choapa's stern. Moreover, it is undisputed that collision with The Choapa could not have been avoided even by an immediate reversal of The Voco's engines. Under these circumstances The Voco's delay in reversing her engines does not constitute actionable negligence. Cf. Oriental Trading & Transport Co. v. Gulf Oil Corp., 2 Cir., 173 F.2d 108, 110–111. Her fault was in proceeding down the easterly side of the channel at an excessive rate of speed, not in the avoiding action she took once that speed made collision inevitable.

■ The Choapa suggests that The Voco was maintaining an inattentive lookout because she failed to hear The Choapa's fog bells before sighting her. The Voco's Master and Second Officer both testified that they heard a fog bell emanating from The Choapa a very short time before the collision but after she had come into view. This does not justify an inference that The Voco's lookout was defective. As stated in The Choapa's reply brief: "the fog bell of an anchored vessel is expected to warn a vessel which is approaching at so moderate a speed that she can stop her headway after sighting the anchored vessel * * * (and) was never intended to guaranty full protection at a distance which would be necessary to warn a vessel * * * approaching at a speed of nearly 10 knots."

Although The Voco collided with The Choapa while wrongfully navigating down the east side of the channel at an excessive rate of speed, the court is of the opinion that The Choapa contributed to the collision by maintaining a dangerous heading across the channel while at anchor.

■ The court does not find fault with The Choapa's Master for dropping anchor in the swept channel when he encountered part of an outgoing convoy in the vicinity of Buoy F. Whether the area outside the easterly edge of the channel was actually free of mine fields is immaterial, since the information of The Choapa's Master was such that his belief that mine fields did exist outside the swept channel was entirely reasonable. This belief was also entertained by the Master of The Poe, and the convoy orders cautioned that waters outside the swept channel "must be considered unsafe." Inasmuch as The Choapa's Master did not know of the existence of a safe anchorage nearby, if any did exist, he was justified in anchoring in the swept channel upon observing vessels of an outbound convoy passing close by at a speed of approximately 10 knots. See Atlantic Refining Co. v. Moller, 320 U.S. 462, 64 S.Ct. 225, 88

L.Ed. 168; The Socony No. 9, 2 Cir., 74 F.2d 233, 234; The Northern Queen, D. C., 117 F. 906, 912. As a matter of fact, in view of the conditions of visibility then prevalent, it would have been imprudent for him not to have anchored. See The A. P. Skidmore, 2 Cir., 115 F. 791, 792.

Nevertheless, The Choapa must be held at fault for permitting herself to swing on her anchor to a position where she constituted an unreasonable obstruction in the channel. The Choapa's Master testified that when he anchored about a half mile above Buoy F his heading was approximately 350 degrees, but that when the wind later changed to southwesterly The Choapa swung on her anchor in that direction until she was heading between 190 and 200 degrees true. However, witnesses for both The Choapa and Voco are in agreement that the collision occurred at an angle of 90 degrees, and The Voco's gyro compass recorder establishes that The Voco was proceeding on a course of 164 degrees true when she ran into The Choapa. It seems clear, therefore, that The Choapa's Master was mistaken in his estimate and that at the time of collision The Choapa was actually heading approximately 254 degrees true and lying lengthwise across the channel. Her Master admitted that he knew he was in the swept channel when he sighted Buoy F, and even though he did not know the exact channel course at that point, he had ample opportunity while at anchor to observe the general direction of several vessels in the outgoing convoy. This is apparent from his testimony that while his heading was approximately 350 degrees he observed several ships proceeding outbound past his port side and that after The Choapa had swung on her anchor he saw a number of ships passing across his bow and two across his stern. The Choapa's Third Officer also testified that he observed several outgoing vessels pass across The Choapa's bow and stern. Certainly these observations should have put The Choapa's Master on notice that The Choapa was lying athwart the course of an outbound convoy. Though The Choapa was justified under the circumstances in dropping anchor when and where she did, she was still under a statutory duty not to obstruct the channel any more than was absolutely necessary. 33 U.S.C.A. § 409; see The Caldy, 4 Cir., 153 F. 837, 840. It does not appear whether The Choapa had a stern anchor which she might have used in conjunction with her bow anchor to prevent swinging across the channel (cf. The Hilton, D.C., 213 F. 997, 1000), but there is no excuse for her failure to use her engines, which were admittedly available, to maintain a position in the channel as nearly parallel as possible to the course of the outbound convoy. See The Caldy, supra. It is not an answer to say that The Voco had no right to proceed down the easterly side of the channel and hence can not complain of The Choapa's heading, for this certainly did not give The Choapa license to assume a dangerous crosswise position in the channel when she had ample warning of the proximity and direction of an outbound convoy.

Since The Choapa's obstruction of the channel constituted a statutory violation, she has the burden of showing that her fault in this respect could not have been a cause of the collision. The Pennsylvania, 19 Wall. 125, 136, 22 L.Ed. 148; see Tidewater Association Oil Co. v. United States, D.C., 60 F.Supp. 376, 381. This burden has not been sustained. On the contrary, the court believes that collision probably would have been avoided if The Choapa had maintained a position in the channel approximately parallel to the direction of the outgoing convoy. In that event, instead of exposing her entire length of 307 feet to The Voco, The Choapa would have presented only her beam, a target of 41.7 feet, which The Voco in all likelihood would have avoided by keeping her engines at slow ahead and her helm hard aport. It follows that The Choapa's negligence contributed to the collision.

The Voco contends that The Choapa was also at fault for not being equipped with efficient fog bells, and if she was so equipped, for failing to sound them vigorously. The evidence discloses that The Choapa's fog bells were rung by means of a rope and clapper, but the mere fact that they were hand-operated does not war-

rant an inference that they were inadequate. The fog bell apparatus condemned in The Georgia, D.C., 208 F. 635, 645, was operated from the bridge by a 40 or 50 foot cord attached to the tongue of the bell, and does not resemble The Choapa's method of operation. Nor is the court convinced that The Choapa's fog bells were rung lackadaisically before The Voco came into view. The seaman who rang the stern fog bell testified that the sound was "sufficiently energetic," and although it may not have been audible at a distance of 1500 feet, the court has already indicated its view that it is not the function of a fog bell to warn a vessel proceeding at a speed of approximately 10 knots of the presence of an anchored vessel in time to avoid collision.

The Voco also asserts that The Choapa failed to maintain a vigilant anchor watch and that had she done so she might have avoided collision by putting her engines full ahead sooner than she actually did. This contention is based on the assumption that The Voco was not observed by those on board The Choapa until she was only 600 feet away, whereas The Voco's lookout reported sighting The Choapa at a distance of approximately 1500 feet. The Choapa's Master estimated that he first sighted The Voco at a distance of two ship lengths (600 feet), and the Third Officer's estimate was two or three ship lengths. However, the seaman who was ringing the fog bell at The Choapa's stern testified that he sighted The Voco about four ship lengths (1200 feet) away and immediately began sounding the bell without interruption. This variation in the several estimates demonstrates the difficulty of judging distances accurately in a dense fog, and the court is not convinced by them that The Choapa's anchor-watch was appreciably tardy in sighting The Voco. In any event, the anchored Choapa certainly was not under a duty to attempt to steam ahead before she had an opportunity to observe what move the oncoming Voco would make to avoid collision.

Finally, The Voco charges that The Choapa was unnecessarily abandoned and that her abandonment was caused by her collision with The British Harmony the night before. Neither of these contentions can be sustained.

The Voco contends that The Choapa's engine room was unjustifiably abandoned without any order from her Master, that her Master failed to make an adequate personal investigation of The Choapa before ordering her abandonment and that he wrongfully refused to return to his vessel and attempt to plug up her leaks by means of collision mats. The Choapa's crew concededly abandoned the engine and boiler rooms on their own initiative shortly after The Voco collision. However, they could hardly have been expected to remain at their posts in the midst of live steam until they received an order to abandon. The affirmative testimony of The Choapa's witnesses as to the existence and pervasiveness of such steam is entitled to greater weight than the negative testimony of The Voco's witnesses in view of the fact that the latter did not have the same opportunities of observation. See Courtney v. Walker, 4 Cir., 26 F.2d 583, 585; The Fin MacCool, 2 Cir., 147 F. 123, 127. Nor does the evidence support the suggestion that The Choapa's Master lacked sufficient information concerning the condition his vessel was in when he ordered her abandonment. While it is true that he was unable to see any break in the side of The Choapa above the water line in the area where she had been struck by The Voco, a few minutes after the collision he received a report of soundings taken of No. 4 hold which disclosed the presence of four or five feet of water, and about five minutes later he was notified that the water in the hold had risen to ten feet. He also had been informed that live steam had enveloped the engine room and made it impossible to operate the stern pumps. On the basis of this information, and having in mind the safety of his crew, he dispatched an S.O.S. signal and gave the order to abandon ship. Under these circumstances the court is not prepared to say that he acted prematurely. By the same token, he should not be condemned for not adopting the suggestion of The Voco's Master that he return to his vessel and attempt to stem the inrush of water with collision mats. His reply to this sug-

gestion was that the situation was "hopeless", and in view of the rapid rise of water in The Choapa's after holds it is extremely dubious that collision mats would have succeeded in stopping the influx. The Choapa's Master was in a far better position than The Voco's Master to judge the seriousness of the damage to his vessel and whether it could be remedied, and the court can not say that his judgment in these respects was faulty.

The Voco's argument that The Choapa was abandoned on account of leaks caused by her collision with The British Harmony is refuted by a clear preponderance of the evidence. There is no reason to disbelieve the testimony of The Choapa's witnesses that the water in her bilges never rose above 18 inches during the time between The Harmony and Voco collisions and that the damage caused by The Harmony did not interfere with The Choapa's subsequent navigation. Witnesses for both The Harmony and Choapa described their collision as a light scraping blow, and this is substantiated by the fact that The Choapa was still afloat 19 hours later. On the other hand, The Choapa's witnesses characterized The Voco collision as a violent one causing The Choapa to roll several degrees to port, and although various witnesses for The Voco minimized the force of the impact, her lookout readily agreed that it was heavy. At the moment of collision the headway of the fully laden Voco was between two and four knots, and since it is undisputed that she went head on into the starboard side of The Choapa at the forward end of No. 4 hold, an extremely vulnerable area, it is reasonable to infer that she dealt The Choapa a severe blow despite the fact that The Voco's stem was not materially damaged. Inasmuch as any leakage occasioned by The Choapa's collision with The Empire Garrick was confined to The Choapa's forepeak and concededly was not vital, it follows that the heavy inrush of water into The Choapa's after holds was the direct result of the Voco collision. It was the flooding of these holds, coupled with the fact that the escape of live steam in the engine room prevented pumping operations, that caused The

Choapa to sink. For this The Harmony bears no responsibility.

The court is of the opinion that the collision between The Choapa and Empire Garrick resulted from the combined negligence of The Choapa, Voco and Garrick.

The Choapa was in virtually the same position at the time of The Voco and Garrick collisions, and hence was still obstructing the channel when The Garrick ran into her. Once again collision probably would have been avoided if The Choapa had maintained a heading parallel to the path of the outbound convoy.

The Voco contributed to The Garrick collision in two ways. First, she precipitated the avoiding action taken by The Choapa which carried the latter 70 or 80 feet west of her anchorage and that much closer to the path of The Garrick. Secondly, The Voco collision so disabled The Choapa that she was unable to use her engines to back clear of The Garrick. Since The Garrick ultimately glanced off The Choapa's stem, it is likely that collision would have been avoided if The Choapa had not proceeded 70 or 80 feet westward in an effort to move out of The Voco's way, and even then it might have been averted if The Voco collision had not put The Choapa's engines out of commission so as to prevent their reversal when The Garrick was sighted.

The Garrick was at fault for navigating on the east side of the swept channel and for failing to take prompt avoiding action.

Since The Choapa's position did not change materially after The Voco collision, and since when first sighted The Garrick was heading toward the starboard side of The Choapa just forward of the midships area, the finding of the court that The Choapa anchored east of mid-channel is dispositive of The Garrick's location at the time of her collision. The story of The Garrick's Master that he saw or heard all of the mid-channel buoys on his port hand while proceeding down the channel, even if true, would not preclude the possibility that The Garrick strayed into easterly waters below buoy G. Curiously enough, The Garrick's logbooks contain no mention

of any of these buoys, although her Master admitted that it was customary to record their passing if they were either seen or heard. Moreover, The Garrick's apprentice, who was on watch on the starboard wing of the bridge, contradicted his Master when he testified that he saw at least one mid-channel buoy on his starboard beam. In view of the fact that The Garrick violated her convoy orders by navigating on the east side of the channel, and that this violation contributed to the collision, she must be held partially responsible therefor. Tidewater Associated Oil Co. v. U. S., D.C., 60 F.Supp. 376, 381-382.

The Garrick was also guilty of negligence in failing to stop and reverse her engines until one minute before collision. Her Master testified that the first he knew of any trouble was when he heard three short blasts very fine on the port bow and that he instantly stopped his engines and went full speed astern. Almost immediately thereafter he observed The Choapa and Voco in collision approximately 1000 feet ahead and put his wheel hard astarboard. Collision between The Garrick and Choapa occurred a minute later. The Voco's Master testified that before colliding with The Choapa he blew three short blasts on his whistle when he went full astern and that after collision he blew danger signals at short intervals. The Voco's engine room log contains the following pertinent entries.

| | |
|---|---|
| Ahead slow | 2.50 |
| Astern full | 2.51 |
| Full astern | 2.52 |
| Ahead dead slow | 2.53 |

The "2.53" engine movement occurred shortly after the collision and indicates when The Voco went up against The Choapa's side pursuant to the latter's request. The Voco's Master testified that he had been up against The Choapa for about a minute when his stern lookout reported the approach of The Garrick and that The Voco thereupon went full astern. In view of the chronology of these events it seems likely that the blasts heard by The Garrick's Master were one of the danger signals sounded by The Voco after her collision with The Choapa. If so, The Garrick's lookout was negligent for failing to hear the three short blasts sounded by The Voco when she went full astern some two or three minutes earlier before colliding with The Choapa. This inference is supported by the fact that it was the Master of The Garrick who heard the blasts, not her lookout, who testified that he did not hear any whistle signals at all before his vessel struck The Choapa. On the other hand, if the blasts heard by The Garrick's Master were those sounded by The Voco when her engines were put full astern before her collision with The Choapa, The Garrick was guilty of inexcusable delay in failing to stop and reverse her engines earlier than one minute before colliding with The Choapa. Had The Garrick stopped and reversed shortly before The Voco collision, her headway would have been substantially reduced by the time The Voco and Choapa came into view and her starboard rudder action probably would have avoided collision.

 The collision between The Garrick and Poe, in the opinion of the court, was the proximate result of the negligence of The Choapa, Voco and Garrick. It was reasonably foreseeable that The Garrick, upon observing that the Choapa and Voco were lying athwart her course, would take the avoiding action that threw her across the path of the starboard column of the outbound convoy. While it is true that The Garrick might have avoided The Poe if she had straightened out on her down channel course immediately after clearing The Choapa, the Master of The Garrick was suddenly confronted by what he considered to be the immediate necessity of anchoring and ascertaining the damage to his vessel. Under these circumstances, the court can not say that his failure to return to the outbound channel course before attempting to anchor constituted an independent intervening cause of The Poe collision so as to relieve The Voco and Choapa of all responsibility therefor. Cf. The Vera, 1 Cir., 226 F. 369, 371.

Nobody has seriously urged that The Poe was negligent in any respect, and the court has been unable to find any fault with

her navigation. There is no dispute that The Poe, while proceeding down the channel in the starboard line of the convoy, kept to the west of the mid-channel buoys. Her avoiding action was begun as soon as The Garrick was sighted moving across her path, two minutes before collision, and the court can not say that this was not prompt under the circumstances. True, The Poe had previously heard danger signals on her port side, but her Master testified that these were well clear of his vessel, and this seems plausible in view of the fact that The Voco-Choapa-Garrick collisions, which undoubtedly were the source of the signals, occurred somewhat to the east of mid-channel. Nor can The Poe be condemned for not hearing a two-blast signal, indicating a vessel stopped in the water, presumably sounded by The Garrick some time after her collision with The Choapa. Assuming that such a signal was blown before The Poe sighted The Garrick, and there is reason to doubt this because at that time The Garrick still had way on her, The Poe can not be blamed for failing to distinguish it amidst the continuous sounding of danger signals by The Voco. It follows, therefore, that The Poe must be absolved.

With respect to the apportionment of damages, the owners of The Choapa's cargo are entitled to recover the full amount of their losses from The Voco, less the value of any cargo damage resulting from The Harmony collision, subject to The Voco's right to limit. The New York, 175 U.S. 187, 209-210, 20 S.Ct. 67, 44 L.Ed. 126. The Choapa's claim in The Voco limitation proceeding is allowed to the extent of one half her total loss, after deducting the damage sustained as a result of her collision with The British Harmony, which is recoverable from The Harmony. The Choapa's libel against The Empire Garrick must be dismissed because The Choapa was already doomed as a result of the fatal blow dealt by The Voco when The Garrick ran into her. The Voco is entitled to a decree against the limitation fund of The Choapa in the amount of one half her damages. The Garrick is entitled to recover two-thirds of her damages; one-third from The Choapa and one-third from The Voco, subject, of course, to their right to limit. The Eugene F. Moran v. New York Central & H. R. R. Co., 212 U.S. 466, 29 S.Ct. 339, 53 L.Ed. 600; The Socony No. 123, 2 Cir., 78 F.2d 536. Inasmuch as The Poe did not assert any claim against The Garrick, she may only recover two-thirds of her damages, these to be equally assessed against The Choapa and Voco, subject to their right to limit. Since neither the cargo owners nor The Poe were at fault in any respect, their claims should be given priority. United States v. City of New York, D.C., 8 F.2d 270, 277; see The George W. Roby, 6 Cir., 111 F. 601, 616. Counsel may submit findings of fact and conclusions of law in conformity with this opinion if deemed advisable.