## THE CITY OF ALEXANDRIA.[1]

### DEEP SEA HYDRAULIC DREDGING CO. v. THE CITY OF ALEXANDRIA.

*(District Court, S. D. New York. June 17, 1887.)*

1. COLLISION—TUG AND TOW AND STEAM-SHIP—LIABILITY.
   The rule in *Sturgis* v. *Boyer*, 24 How. 110, that the tug is alone responsible for damages upon a collision between her tow and other vessels, is applicable only when the tow is wholly under the charge and control of the tug.

2. SAME—FOG-SIGNALS—INSPECTOR'S RULES.
   It is gross negligence in a tug, when taking a tow in a fog across the harbor of New York, in such manner that outgoing vessels are on her starboard hand, neither to blow fog-signals, nor to give the three blasts that indicate a tow, under the supervising inspector's rule 10.

3. SAME—DUTY OF TOW.
   Under like circumstances, it is negligence in the tow sufficient to charge her with fault, if, though fitted with a whistle, and having the general direction of the tug, she does not use her own whistle to indicate her position, nor give any directions to the tug, when it is observed that the tug is silent. Reasonable signals of danger are obligatory in all dangerous situations.

4. SAME—LENGTH OF HAWSER—FOG—CALM SEA—FAIR-WAY.
   In a fog, with a calm sea, a towing hawser 400 to 600 feet in length is unnecessarily long and dangerous in crossing a fair-way; and if the length of the hawser is under the control of the tow, and accident results, the tow will be held jointly in fault.

5. SAME—STEAM-SHIP AND TOW—SPEED—APPROACHING FOG-BANK—APPORTIONMENT—STATEMENT OF CASE.
   The tug A. was taking the dredge Q. from Gedney's channel to Sandy Hook, on a hawser 400 to 600 feet long. Both were enveloped in a bank of sea-fog;

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

but neither the tug nor the dredge, which had a steam-whistle, sounded signals. The steam-ship City of A., going out to sea by way of the Swash channel, and just entering the fog-bank, which did not extend into the Upper bay, did not slack her full speed of 11 or 12 knots. When about 500 yards off she first discovered the tug, and nearly ahead, and crossing her course to starboard, received two whistles from her, but no signal to indicate a tow. The steamer, being then unable to see the tow or the hawser, accordingly sheered to port, and ran into and sank the dredge. *Held,* that the tug was in fault for not sounding whistles of any kind; that the dredge was in fault for not whistling herself, nor directing the tug to whistle, and for the length of her towing hawser; that the steam-ship was in fault for her immoderate speed in the fog. The tug not being a party to the suit, the damages were divided between the dredge and the steam-ship.

In Admiralty.

*Geo. A. Black,* for libelant.

*A. O. Satter* and *R. D. Benedict,* for claimant.

BROWN, J. On the ninth of September, 1886, at about 5:12 P. M., as the steamer City of Alexandria was going out to sea, by way of the Swash channel in the Lower bay, she came in collision with the libelant's dredge Queen, which had been employed by the government in dredging Gedney's channel. The Queen was then returning from work to lie up for the night at Sandy Hook, and was in tow of the steam-tug Argus, on a hawser from 400 to 600 feet long. The stem of the steamer ran into the port bow of the dredge, cutting at least half way through her, and causing her to sink almost instantly, to the libelant's alleged damage of $85,000, to recover which this libel was filed.

The place of collision is fixed, within a few hundred feet, by the situation of the wreck as afterwards determined, which was found to be about one-fifth of a mile to the westward of the junction of the Swash and main ship channel courses, as laid down upon the chart. The wind was very light from the south-east; the tide slack flood; the weather tolerably clear towards New York, but with a rather thick fog creeping in from sea. The fog ahead of the steamer so obscured both the tug and the dredge that they were not and could not be observed by her at a distance of more than 400 or 500 yards. The dredge started for Sandy Hook at precisely 5 P. M., and at the time of the collision the tug and dredge were proceeding on a course of west by south at the rate of about three and one-half or four knots.

The City of Alexandria, in going down the lower part of the Swash channel, had gone a little more to the westward than intended; so much so as to pass a few feet to the west of buoy ———, known as the "Palestine Buoy," where she sheered one point to starboard. About that time she heard two whistles given her by the tug, and was then first able to discern the tug, bearing nearly ahead and partly on her port bow, and estimated to be 400 or 500 yards off. She immediately replied with two whistles to the tug's signal, at the same time starboarded her helm, and soon after, seeing the hawser that ran astern of the Argus to the dredge, immediately put her helm hard a-port, and stopped and backed her engines, but too late to avoid collision.

The general cause of this collision was, doubtless, the fog in the Lower bay. It so obscured the tug and tow, which formed altogether a line of some 700 or 800 feet, moving across the steamer's course, that the latter, upon the speed at which she was going, was not able to avoid the tow after it was discovered. But the fog was obvious to both. The steamer is chargeable with knowledge, not merely that vessels were liable to be coming in, but that this dredge, in tow of the tug, was also likely to be coming upon the very course upon which she was coming, on returning as usual from the daily work on which she had been long engaged. The tug and tow were equally chargeable with knowledge that they were running in a fog across the course of steamers going out to sea. Only very shortly before, two other steamers,—first the Trinidad, and next the City of Augusta,—at intervals of a few minutes only apart, in going out through the Swash channel, had narrowly escaped collision, clearing the dredge by from 100 to 300 feet only. Upon these facts there seem to be very plain faults in all the three vessels.

1. The Argus, which for some reason has not been brought in as a party, was grossly in fault, because, being bound to keep out of the way of outgoing vessels on her starboard hand, and having a tow of a length that was dangerous in a fog in such a situation, and moving somewhat across the course of outgoing steamers, she neither blew any fog-signals as required by the statutory rule, nor, more important still, did she blow the signal of "three distinct blasts in quick succession, repeated at intervals not exceeding one minute," to indicate that she had a tow, as required by subdivision 8 of the supervising inspector's rule 10. Rules of 1886, p. 170. Moreover she gave a signal of two whistles to the City of Alexandria, thus telling her to go astern, without giving the three towing whistles to apprise her of the danger of going astern and across the line of the tow. These faults are so manifest and so important that it is unnecessary to refer to others on the part of the Argus.

2. The dredge must also be held in fault, because she was partly to blame for the mode of navigation adopted, and for the absence of all signals of danger. The tug was, in general, subject to the orders of the master of the dredge. Orders were communicated between them by signals as to towing during work; and though, when being towed in at night, the details of navigation were doubtless left mainly to the tug, the latter was still subject to the general orders of the master of the Queen. I think both were responsible, therefore, for the absence of proper signals upon the principles applied in the cases of *The Civilta*, 103 U. S. 699, 702; and *The C. P. Raymond*, 26 Fed. Rep. 281. The misconduct of the tug, in neither sounding fog whistles nor towing whistles, was very plain. The situation and the course of the tug and tow were specially dangerous to outgoing vessels. The dredge had narrowly escaped collision shortly before. She had neither sails, motive power, nor rudder, and could do nothing, therefore, to avoid other vessels, which made her the more dangerous; but she had a steam-engine, provided with whistles, like the tug, by which her position in the fog could be indicated. The necessity of whistles was known to her officers, and the matter was

spoken of between them, but it was concluded to "let the tug do the whistling;" yet though the tug's omission to whistle was evident, and the danger great, she gave no orders to the tug, and gave no whistles herself, as she might have done, to apprise other vessels of her position.

In the case of *The Peshtigo*, 25 Fed. Rep. 489, it was held that a tow thus enveloped in a fog should give notice of her position by whistles; and it was so held although the proper whistles were being sounded by the tug. Much stronger is this case against the Queen, because, knowing that the regulations were being violated by the omission of all fog whistles, and that her situation and course were dangerous to outgoing vessels, she took no measures to give notice to approaching vessels of the very great danger. While there is no statute nor regulation that in terms requires a tow thus situated to give such signals, there is none that forbids it; and every vessel is bound by the general maritime law, as is recognized by the provisions of article 24 of the new rules, to give such reasonable notice of obvious danger as the special circumstances may require, and such as are easily within her power to give. This principle is applied in a great variety of forms. The requirement that a sailing vessel shall shorten sail in a fog when going at considerable speed in waters where other vessels are to be expected, (*The John Hopkins*, 13 Fed. Rep. 185; *The Rhode Island*, 17 Fed. Rep. 554, 557, 559, and cases there cited; *The Colorado*, 91 U. S. 701, 702,) and that some signal should be given at night to an overtaking vessel astern, (*The Oder*, 13 Fed. Rep. 272; *The State of Alabama*, 17 Fed. Rep. 847, 858,) may be cited as examples.

The rule applied in the case of *Sturgis* v. *Boyer*, 24 How. 110, that the tug alone is responsible for the damages upon a collision between her tow and other vessels, is applicable only where the tow is wholly in charge of the tug, and under her control, as the Wisconsin was in that case. When the tow is manned by her own officers and men, the duty of reasonable skill and care is imposed on them, upon the principles above referred to. "The exercise of reasonable skill and care," it is said in the case of *The Margaret*, 94 U. S. 494, is, in such a case, "incumbent on the tow." *The Galileo*, 28 Fed. Rep. 469. Regard for the safety of life and property imperiled by collision does not permit the court in this case to overlook the plain neglect of ordinary precaution by the dredge to avoid obvious danger, by sounding her whistle to give notice of her position in this fog; or her neglect to give suitable orders to the tug, or independent signals of her own, when the misconduct of the tug in omitting them made such precaution the more imperatively necessary.

Nor can I regard the tow as wholly free from fault in regard to the length of the hawser. In a calm sea, such as existed at that time, and in foggy weather, a hawser was used much longer than, upon the evidence, I think was necessary. The great length of the hawser added much to the danger. Considering the long employment of the dredge in this business, the officers of the dredge must be deemed familiar with the dangers of a long hawser in a fog, and with the fact that a much shorter one was sufficient in calm weather. I must hold the dredge, there-

fore, chargeable with fault, jointly with the tug, for starting with a hawser of such length. The evidence indicates that with a shorter hawser the collision would have been avoided.

3. The City of Alexandria must be held in fault for not going at a "moderate speed" in a fog. There is some conflict as to the amount of fog that prevailed before reaching the tug and tow, and as to the distance northward to which the fog extended; but there can be no question that the tug and tow were in a pretty thick fog, since they could not be seen more than 300 or 400 yards off; and, when the tug was first made out, neither the dredge nor the hawser could be seen. Though the bay above the steamer was comparatively clear, the fog in the region of the tug and tow was plain. This alone was sufficient warning to the steamer to diminish her speed. That she was overtaking a faster vessel ahead of her, which had slowed down in consequence of the fog, was an additional notice to the City of Alexandria to slow. Even if this were the case of an abrupt, dense bank of fog, which, upon the testimony, is not probable, she had no right to run into the fog-bank at full speed. She was bound to slow down previously, because otherwise she could not comply with the rule that requires her to be going at "moderate speed" the moment she is in it. Mars. Coll. (2d Ed.) 349; *The Milanese*, 4 Asp. 218. Computation based upon the time and distance run shows that the steamer must have been going at the rate of at least 11 or 12 knots. She did not slow or reverse until after the tug was seen within 300 or 400 yards, and I can have no doubt, upon the evidence, that she was then in such a fog as made full speed unjustifiable. *The Nacoochee*, 28 Fed. Rep. 462; *The State of Alabama*, 17 Fed. Rep. 847, 852; *The City of New York*, 15 Fed. Rep. 628.

There is some evidence that would indicate that the first mate, who was on the lookout, was not specially observant at the moment when the steamer and dredge first came in sight. But I do not think this possible momentary failure on his part contributed to the collision; nor can I regard it as a fault, aside from the general rule requiring moderate speed in a fog, that the steamer did not reverse immediately on seeing the tug, or on hearing her whistles, nor until the hawser was perceived. The steamer had a right to count on hearing the signals of a tow, if there was one. She had no difficulty in avoiding the tug, the only vessel at first indicated to her. I hold her liable for not having sooner slowed down, so as to be running at "moderate speed," as soon as she entered the fog, as I think she was required by law to do. This would have avoided the collision, notwithstanding the faults of the tug and tow. Decree for half the damages, and the costs divided.