**VILLAIN & FASSIO E COMPAGNIA INTERNAZIONALE DI GENOVA SOCIETA RIUNITE DI NAVIGAZIONE, S.P.A., as owner of the MOTOR VESSEL ANGELA FASSIO, Libelant,**

v.

**The TANK STEAMER E. W. SINCLAIR, her engines, boilers, etc., and Sinclair Refining Company, Respondent (and Cross-Suit).**

United States District Court
S. D. New York.
Aug. 2, 1962.

Ehrich, Stock, Valicenti, Leighton & Holland, by Albert D. Jordan, Robert Nicol and Gordon W. Paulsen, New York City, for libelant.

Burlingham, Underwood, Barron, Wright & White, by Stanley R. Wright, and Edward L. Wyckoff, New York City, for respondent.

EDELSTEIN, District Judge.

This is a consolidated cause arising out of a collision between the motor vessel ANGELA FASSIO and the tanker E. W. SINCLAIR on the morning of December 3, 1959, in the Delaware River. The ANGELA FASSIO, owned by libelant, Villain & Fassio E. Compagnia Internazionale Di Genova Societa Riunite Di Navigazione, S.p.A. (Villain & Fassio), was built in 1956. She is 492 feet long, 62 feet abeam, of 7016 gross tons, and powered by 5500 h. p. diesel motors. At the time of the collision her drafts were about 12′ 1″ forward and 16′ 9″ aft. The E. W. SINCLAIR, owned by respondent Sinclair Refining Company (Sinclair), is a tanker built in 1942. She is 520 feet long, 72 feet abeam, of 10,907 gross tons and powered by a 6000 h. p. turbine. On the day of collision, her drafts were approximately 31 feet forward and 30′ 6″ aft.

On the trial, the only really substantial dispute as to the facts concerned the nature and timing of certain signals sounded by the FASSIO. The chronicle of this collision is fairly well established by the evidence.

On the fateful morning, the ANGELA FASSIO, inbound from New York to Philadelphia under the command of Captain Giovanni Zustovich, picked up a Delaware River pilot at 6:45 a. m. at the Pilot Station. She proceeded up the river until fog was encountered at about 9:00 a. m. near Buoy 42. Believing that it was dangerous to continue up the river, the master and pilot made preparations to turn to starboard out of the

channel in order to anchor. By 9:20 a. m. the FASSIO was properly and lawfully anchored in the fog off Arnold Point, approximately 250 meters east of the Liston Range of the Delaware River channel. She was anchored 0.4 of a mile northwest of Buoy 42 to three shots of chain (45 fathoms) on a heading of 150° true, directly into a flood current of about 1½ knots then running up channel in a northwest (330° true) direction. Visibility in the area at that time was limited to 100 yards due to the dense fog prevailing. The captain and watch officer remained on the bridge while the pilot went below to rest. A double anchor watch, consisting of the ship's carpenter and an able-bodied seaman, was posted on the bow. From the time of anchoring to the time of collision, the fog bell signal prescribed by the Inland Rules, 33 U.S.C. § 191, 33 U.S.C.A. § 191 (1958), was sounded continuously by the anchor watch.

Sometime before the collision, the chief officer of the FASSIO, then standing on the starboard wing of the bridge, reported to the captain that he thought he heard a distant whistle signal. Almost immediately thereafter, the watch officer reported a target on the radar screen. At what time this happened, as well as the timing of all the subsequent events, is vigorously disputed by the SINCLAIR. Resolution of these questions of fact is difficult in view of the conflicting testimony. But the course of events is clear even if the precise moment when each act took place is not. For the moment, the narrative will proceed using the timing urged by the FASSIO.

When these two reports were given to the captain, approximately twenty minutes before the collision, he remained on the wing of the bridge for a minute or two, listening for a further signal. Hearing nothing, he relieved the watch officer at the radar screen. The radar with which the FASSIO was equipped was a Decca model, in good working order, which had been set on a three mile range. Calibration of the radar had been checked by visual comparisons the prior evening and that same morning. Captain Zustovich observed the target to be 2.2 miles distant and approaching on the easterly edge of the channel. By observing the approaching target's movement over a three-minute period, he computed its speed to be twelve knots or better. Continuing his radar observations, the captain correctly determined that the approaching target was a ship moving at high speed on the extreme easterly edge of the channel.

█ As the captain continued to observe the oncoming vessel he became apprehensive. He knew that the fog was present around Buoy 42, having encountered it only a half hour earlier, and knew that visibility was limited to 100 yards. He was aware that the limit of range of a fog bell was about 0.3 of a mile. He had no way of knowing whether the other vessel had radar.[1] Thus, he was concerned lest his presence and posi-

---

1. The SINCLAIR was also equipped with radar. Her radar, however had failed after leaving Houston on this trip and was inoperative at the time of the collision. Under the circumstances of this case, no fault is chargeable to the SINCLAIR because her radar was inoperative, nor has the FASSIO urged this as a fault.

With the ever increasing use of radar at sea, it is becoming more and more a factor in cases arising out of collisions. The courts have not yet formulated definite rules requiring the use of radar. But if a vessel is equipped with properly functioning radar, there is an affirmative duty to use it in or near a low visibility area. See Afran Transport Co. v. The Bergechief, 274 F.2d 469, 474 (2d Cir. 1960) and cases cited; White Stack Towing Corp. v. Bethlehem Steel Co., 279 F.2d 419, 423 (4th Cir. 1960); Annot., 82 A.L.R.2d 764 (1962). In Afran Transport, the Court stated its view that the case of The T. J. Hooper, 60 F.2d 737 (2d Cir.), cert. denied, 287 U.S. 662, 53 S.Ct. 220, 77 L.Ed. 571 (1932), "shows which way the wind blows" with respect to the eventual establishment of a rule requiring radar. 274 F.2d at 474. If such a rule were now in existence, the failure of the radar on the SINCLAIR would have been an issue bearing on fault.

tion were not known to the other vessel. He considered the possibility that the approaching vessel might intend to anchor due to the fog, as he himself had done earlier. In any event, he knew that the current was setting in somewhat of an easterly direction from the channel toward his vessel. He could not be certain that the moving vessel was not slightly to the east of the channel. Based upon all these factors and the high speed of the approaching vessel, Captain Zustovich was concerned that his bell would not be heard in time to prevent a collision. Fearful that a danger of collision existed, he decided to give a signal, supplementary to his bell, to warn the approaching vessel of his presence and position.

When the approaching vessel was a mile away, according to his radar observations, the captain personally sounded the international "R" signal (a short blast of one second, a long blast of five seconds, and a short blast of one second). He observed that the ship's clock mounted in the forward bulkhead of the bridge showed the time as 9:44 plus a few seconds. When the approaching vessel was 0.5 of a mile distant, near Buoy 42, and continuing to approach with apparently undiminished speed, the captain ordered the chief officer to sound the "R" signal again. The watch officer observed the ship's clock to show 9:47 at the time the second signal was sounded.

Here there is a slight discrepancy in the evidence. At the trial, the captain testified that shortly after the second whistle signal was sounded he saw the target of the approaching ship merge with the target of Buoy 42 on the radar screen and almost immediately lost the image of the ship in the "sea return." This is a bright disc or spot in the center of the radar screen caused by the reflection of the radar waves from the waters near the vessel. In his nautical journal, the captain recorded that the approaching vessel's pip merged with Buoy 42 a moment before he ordered the sounding of the second "R" signal.

I do not believe that it makes any difference whether the pip merged with the image of the buoy a moment before or a moment after the signal sounded. Suffice it to say that the second signal was made at about the time the SINCLAIR was at Buoy 42.

After the second signal was sounded, Captain Zustovich went to the starboard wing of the bridge and ordered the anchor watch to "intensify to the maximum" the ringing of the fog bell. The captain and his officers remained on the starboard wing of the bridge until, some three minutes later, the E. W. SINCLAIR came out of the fog at observably high speed and struck the ANGELA FASSIO. The time of the collision, according to the clock aboard the FASSIO was 9:50 a. m.

On the SINCLAIR, meanwhile, events were proceeding apace. The E. W. SINCLAIR, inbound to Philadelphia on a coastwise voyage from Texas with a full cargo of 16,000 tons of Bunker "C" heating fuel, was under the command of Captain Richard E. Dutson. She arrived at the Pilot Station shortly after the FASSIO and picked up her pilot, Francis Reardon, shortly before 7:00 a. m. The vessel then proceeded up channel in clear weather with visibility extending up to twelve miles. She was proceeding at a sea speed of 13.3 knots. A freighter, which later proved to be the ANGELA FASSIO, was observed by the captain and pilot approximately four miles ahead of the SINCLAIR. She was proceeding rapidly up the channel and not much attention was paid to her. Nor was any effort made to keep track of her.

About half way between Ship John Light and Buoy 42 fog was observed approximately two miles ahead in the vicinity of Buoy 42. Discussing the situation, the captain and pilot decided that they would make Buoy 42, and that if the fog was dense after entering it, the SINCLAIR would anchor north of Buoy 42. Accordingly, the engines were put on standby, the chief mate was ordered to stand by the anchor, a lookout was

posted on the bow and fog signals were commenced. The order to the engine room was for the purpose of bringing the ship's speed from sea speed to maneuvering speed. The order is regularly given approximately ten minutes before intended maneuvers in order to enable the engine room personnel to adjust the engines and boilers so as to be able to undertake maneuvers involving changes of speed. The effect of the order, when accomplished, was to reduce the engine revolutions from 88, yielding a sea speed of about 13 knots to 66 revolutions, yielding about 10 knots.

It is at this point in the narrative that the timing of the various acts is disputed. The engine maneuvers of the SINCLAIR were recorded in the Engine Room Bell Book. The book is kept in the regular course of business by the engine room personnel, who immediately record all orders which are received. They are not influenced by what is transpiring above decks, nor are they concerned with the reasons for any particular order.

The entries in the bell book conflict in some respects with the testimony of the captain and pilot and with some of the entries made in the deck logs. The entries in the latter documents, unlike those contained in the Engine Room Bell Book, were not made simultaneously with the event. I find that the Engine Room Bell Book constitutes the best evidence of the engine maneuvers and their timing, and it is so accepted.[2]

Counsel for the SINCLAIR, recognizing the inherent trustworthiness of the bell book entries, now also agrees that they provide the best evidence of what occurred on the day in question. It is not surprising, however, that he places a different interpretation on the entries contained therein. Before attempting to resolve the different theories as to the timing of the events, we shall continue the narrative according to the version urged by the SINCLAIR.

About the time the SINCLAIR entered the fog, Buoy 42 was sighted close

2. Counsel for the FASSIO prepared a chart which compares the entries made in the Engine Bell Book with the entries made in the Deck Bell Book and Deck Log. The chart was admitted into evidence without objection as Exhibit 26. It is herewith reproduced.

### E. W. SINCLAIR RECORDS

Comparison of Times Noted
for Particular Entries

| Entry | Engine Bell Book | Deck Bell Book | Deck Log |
|---|---|---|---|
| Arrival Overfalls | 0630 | 0630 | 0630 |
| Full Ahead—Pilot Reardon aboard | 0653 | 0653 | 0653 |
| Standby | 0935 | 0937 | 0937 |
| Engines stop | 0947 | — | 0944 |
| Full Astern | 0947½ | 0946 | 0945 |
| Full Astern | 0948 | — | — |
| Full Astern | 0948 | — | — |
| Collision with Angela Fassio | — | 0947 | 0947 |
| Engines Stop | 0950 | 0950½ | 0950½ |
| Full Astern | 0951 | 0954 — | — |
| Full Astern | 0952 | — | — |
| Stop Engines | 0958 | 0958 | — |
| Slow Ahead | 0958½ | 0958 | — |
| Full Astern | 0959 | 0958½ | — |
| Stop Engines | 1001 | 1001 | — |
| Slow Ahead | 1001½ | 1001½ | — |
| Full Astern | 1002 | 1002½ | — |
| Stop Engines | 1005 | 1004½ | — |
| Slow Ahead | 1005½ | 1005 | — |
| Stop | 1018 | 1017½ | — |
| Let Go Anchor | — | 1019 | 1019 |

at hand on her starboard side. The testimony from the SINCLAIR was that just at that time a signal consisting of three short blasts was heard from ahead. The captain and the pilot knew that the direction and distance of whistle signals heard in fog can be misleading. They were unable to determine the distance of the signal. Nevertheless, the captain and the pilot positively placed the direction of the signal as coming from ahead. Believing that the signal they heard was a backing signal, they assumed that a southbound vessel was in the channel with her engines going astern. The testimony was that the pilot then ordered the engines stopped and ordered a turn of 20° right rudder. Those in charge of the SINCLAIR testified that shortly thereafter they heard a second group of three blast signals, similar to the first, and the pilot immediately ordered full speed astern. Moments later, the SINCLAIR sighted the FASSIO, but it was too late to avoid the collision.

The SINCLAIR collided heavily with the anchored ANGELA FASSIO. The fluke of the starboard anchor and flare of the starboard fo'c'sle of the SINCLAIR struck the starboard side of the FASSIO approximately at the forward end of her No. 1 hold, raking and tearing the steel plates and frames of the starboard side of the FASSIO to the after part of her No. 3 hold, a distance of approximately 180 feet. The SINCLAIR, with her engines full astern, came to rest immediately alongside of and parallel to the anchored FASSIO. The time of collision was recorded on the FASSIO at 9:50 a. m. and recorded on the SINCLAIR as 9:47 a. m.

The FASSIO's theory is that the SINCLAIR recklessly proceeded through the fog at high speed, and she ignored whatever signals she heard and that her 20° right turn out of the channel was for the purpose of anchoring due to the dense fog. SINCLAIR's theory is that she turned right onto a collision course in response to an erroneous and misleading signal from the ANGELA FASSIO. Although some of the facts are sharply disputed, the principles of law governing this case are clear.

A vessel properly at anchor, as was the FASSIO, is entitled to the highest degree of privilege. In a collision between a moving vessel and an anchored vessel, the anchored vessel is presumed to be innocent. "[T]here is not only a presumption in her favor, by the fact of her being at anchor, but a presumption of fault on the part of the other vessel, which shifts the burden of proof upon the latter." The Oregon, 158 U.S. 186, 197, 15 S.Ct. 804, 39 L.Ed. 943 (1894). "Such presumption can be wholly overcome only by proof that the moored vessel was solely at fault, that the moving vessel was without fault, or that the collision resulted from an inevitable accident. Carr v. Hermosa Amusement Corp., Ltd., 9 Cir. 1943, 137 F.2d 983; The Clarita and The Clara, 23 Wall. 1, 23 L.Ed. 146; The Oregon, 158 U.S. 186, 15 S.Ct. 804, 39 L.Ed. 943." United Fruit Co. v. Mobile Towing & Wrecking Co., 177 F.Supp. 297, 301 (S.D. Ala.1959); The Cananova, 297 F. 658 (E.D.Pa.1923); Griffin, Collision § 145 (1949). The SINCLAIR has not rebutted the presumption of fault on her part. On the contrary, the evidence conclusively shows that she was at fault for proceeding through the fog at an immoderate rate of speed.

Article 16 of the Inland Rules, 33 U.S.C. § 192 (1958), 33 U.S.C.A. § 192 provides:

"Every vessel shall, in a fog, mist, falling snow, or heavy rainstorms, go at a moderate speed, having careful regard to the existing circumstances and conditions."

Although each case must depend upon its own facts and circumstances, definitions of "moderate speed" in fog are not wanting. "What is moderate speed under such circumstances is a rate of speed not in excess of that which will permit a vessel to stop within the distance she can see another vessel with which she may be in danger of collision." The Tuxedo, 77 F.2d 354 (2d Cir., 1935); The

Nacoochee, 137 U.S. 330, 339, 11 S.Ct. 122, 34 L.Ed. 687 (1890); The Colorado, 91 U.S. 692, 702, 23 L.Ed. 379 (1876). The rule is stated not only in terms of the range of visibility but also in terms of requiring the vessel to be able to stop before a collision occurs. Furthermore, the moderate speed provision requires that the vessel slacken speed before entering a fog bank, "because otherwise she could not comply with the rule that requires her to be going at 'moderate speed' the moment she is in it." The City of Alexandria, 31 F. 427, 431 (S.D.N.Y.1887); The Munalbro, 280 F. 224, 226 (D.Mass.1922); Donnell v. Boston TowBoat Co., 89 F. 757, 761 (1st Cir. 1898), cert. denied, 172 U.S. 648, 19 S.Ct. 884, 43 L.Ed. 1182 (1899).

No matter what faults she attempts to attribute to the FASSIO, the SINCLAIR cannot avoid the fact that her speed was excessive. This is indicated by the time it took her to traverse the distance of 4.3 miles between Ship John Light and the point of collision. This was accomplished in twenty minutes, making an average speed of 12.9 knots, as compared with her sea speed of 13.3 knots. And during this time, half this distance was covered after her engines had been ordered to maneuvering speed. Furthermore, the SINCLAIR's speed was computed by Captain Zustovich based upon his radar observations. As the SINCLAIR came out of the fog her bow wave was also observed by those on the FASSIO as indicating a speed of about 10 knots, and she closed the distance of visibility in seconds. Notwithstanding that her engines were going full astern at the moment of impact, the SINCLAIR raked down the side of the FASSIO for a distance of approximately 180 feet with such force that she tore through the steel plates and steel frames of the FASSIO. The evidence bears out the conclusion that the SINCLAIR was travelling at about 10 knots through the water. Although visibility was only about 100 yards, it would have taken the fully loaded SINCLAIR, while travelling at that speed, between 2000 and 3500 feet (0.4 to 0.7 of a mile) to come to a standstill after an emergency full astern order was given. Under the circumstances prevailing on the morning of the collision, the SINCLAIR's speed was clearly excessive and constituted a statutory fault in violation of Article 16 of the Inland Rules. 33 U.S.C. § 192 (1958), 33 U.S.C.A. § 192.

The ANGELA FASSIO charges the SINCLAIR with yet another fault with respect to her maneuvers on hearing a whistle signal from the fog. The second paragraph of Article 16 of the Inland Rules, 33 U.S.C. § 192 (1958) 33 U.S. C.A. § 192 provides as follows:

"A steam vessel hearing, apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines, and then navigate with caution until danger of collision is over."

There is no dispute over the fact that the SINCLAIR turned to starboard at some point. The FASSIO contends, however, that this turn was not made in response to any signal, that the engines were not stopped, and that the purpose of the turn was to proceed to anchor. The SINCLAIR urges that her turning maneuver was made in response to a three blast signal from the FASSIO which was heard aboard the SINCLAIR just as she passed Buoy 42. It is here that a sharp conflict exists over the facts. Although I am not at all persuaded by the timing urged by the SINCLAIR, I shall assume her version for purposes of resolving the question of fault for the turning maneuver.

The SINCLAIR urges that the moment the signal was heard when the vessel was near Buoy 42, her captain and pilot assumed that it came from ahead. It indicated to them that a vessel was under way in the channel with her engines going astern. Since there is no cross traffic in the channel, they assumed that the signal they heard came from a southbound vessel. They further

assumed that such a vessel with her engines going astern would tend to pivot her stern to port bringing her over onto the SINCLAIR's side of the channel. Thus, the SINCLAIR's captain and pilot assumed that the safest maneuver was to get out of the channel. They preferred to risk a grounding rather than a collision. They testified that the engines were stopped and a 20° right rudder was ordered.

■ Although there is no absolute rule barring a change of course before the position of the other vessel is ascertained with certainty, this statement is subject to qualification. "A vessel in fog, hearing the signal of another vessel from such a direction as to involve risk of collision, should not alter helm blindly, nor, above all, should she try to make an alteration of helm take the place of proper speed control." Griffin, Collision, § 129 at 324 (1949). In The Vindomora, [1891] A.C. 1, 5, cited by SINCLAIR, Lord Herschell indicated that "in each particular case you must look to see what the circumstances were, and inquire in each particular case, were there circumstances existing which justified the manoeuvre executed, or which prevented that manoeuvre from being a wrong manoeuvre?"

Under the circumstances existing in this case, there is certainly substantial doubt as to the propriety of the SINCLAIR's maneuver. The assumptions upon which she seeks to justify it are questionable. Her captain and pilot assumed that the vessel which was apparently forward of her beam was southbound. They discounted the possibility that she might be northbound because they had not seen another vessel going north. But they had seen the FASSIO heading north earlier in the morning. Merely because the FASSIO had been proceeding up channel rapidly in clear weather did not justify the SINCLAIR in ignoring the possibility that the fog had slowed her down. Merely because the SINCLAIR chose to speed through the fog was no warrant for assuming other vessels would fail to heed the Rules and moderate their speeds. They also discounted the possibility that the signal might have come from a vessel that was maneuvering to anchor or from a vessel that was maneuvering to leave an anchorage. Furthermore, the assumption that a backing vessel's stern will swing to port was supported by a reference to Crenshaw, Naval Shiphandling, 445 (2d ed. 1960). This treatise indicates that the proposition is correct when a vessel is moving from a position dead in the water or moving with little way on. "[B]ut when proceeding Ahead, the conflicting forces may reduce the Side Force markedly or even reverse it. There may be cases where a single-screw ship has a tendency to veer to the Right when moving ahead." Ibid.

Before a helm action is taken in fog, there must be a determination of the other vessel's position which is more than a mere surmise or speculation. Given the prevailing conditions of fog and the known propensity of fog to distort sounds so that determination of position, distance and course is uncertain, The City of New York, 147 U.S. 72, 84, 13 S.Ct. 211, 37 L.Ed. 84 (1893), the SINCLAIR was not warranted in assuming that the vessel she heard was in any particular place or on any particular course. The Celtic Monarch, 175 F. 1006 (9 Cir. 1910). "Her blind alteration of course hard right to starboard, on a mere guess that she might thus avoid collision was clearly a fault * * *." Afran Transport Co. v. The Bergechief, 274 F.2d 469, 472 (2d Cir. 1960); see Griffin, Collision § 129 (1949). The cases cited by SINCLAIR to justify her maneuver do not excuse her. In The Vindomora, supra, the Court's refusal to lay down a hard and fast rule prohibiting course changes was premised upon "a sufficient indication of the position of the other" vessel. [1891] A.C. at 9. In The Umbria, 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053 (1897), the Court recognized that a change of helm is not a fault in every case. Under the facts of that case, the Court found sufficient justification for the IBERIA's change of course.

And the gross fault of the UMBRIA was such that the Court was unwilling to attribute a fault to the IBERIA which would require her to share the damages. In The Lepanto, 21 F. 651, 658 (S.D.N.Y. 1884), the court indicated that the sound heard came from "a precise direction." Moreover, the exoneration from fault for a course alteration was conditioned on the change being "accompanied by the order to stop and reverse at full speed * * *." 21 F. at 659. Thus, although course changes in fog are not condemned universally, the situations where the master's judgment to alter course is approved comprehend circumstances where the position and course of the other vessel are ascertained and where *proper speed* is maintained. See Griffin, Collision 326–27 (1949) and cases cited.

█ Surely, the more prudent course for the SINCLAIR would have been to take off her way and come to a stop in the water before maneuvering. This would have required the engines to be put full astern. But because of the speed at which she was moving, it would have taken her a minimum of four ship lengths to stop, a distance concededly beyond the range of her visibility. Upon hearing a signal from out of the fog she was faced with a dilemma; to reverse engines and stay in the channel while trying to stop, or to take her chances to the right of the channel. Generally, a master will not be charged with a fault for a reasonable judgment which he makes in a moment of peril. See Green v. Crow, 243 F.2d 401, 403 (5th Cir. 1957); Petition of Socony Vacuum Transp. Co., 93 F.Supp. 718, 727 (S.D. N.Y.1950). But this is only the case where the master is put into a position of peril not of his own making. The SINCLAIR's dilemma here is clearly attributable to her excessive speed. For purposes of this analysis, we may even disregard the question of what signal the FASSIO sounded. It is apparent that the SINCLAIR was concerned less with its character than with its direction.[3] Had she heard the "R" signal or a danger signal instead of the three blast backing signal she claims to have heard, it is reasonably probable that her actions would have been the same. She heard a signal forward of her beam and apprehended a collision with a vessel presumed to be in front of her. Her maneuver to the right ensued. If in fact her turn was made in response to a signal, it was made because her excessive speed left her no alternative. Her helm order at the speed she was travelling in fog was clearly dangerous. Had the SINCLAIR been travelling at the moderate speed which the Rules require, she could easily have stopped and ascertained the presence of the signalling vessel. And if she made a judgment to turn, she could have stopped upon sighting the FASSIO, had her speed been moderate.

Counsel for the SINCLAIR argues that the court should be guided by the probabilities in determining the truth where the facts are in dispute. He contends that it is improbable that a fully loaded tanker would be guilty of maneuvering through the fog at a rate of speed in violation of the Inland Rules. The facts, however, conclusively prove that the SINCLAIR was proceeding at a speed in excess of that demanded by the Rules. "The fact that the rule is

3. This is borne out by Captain Dutson's testimony. In response to questions as to whether the signal might have come from a vessel maneuvering to anchor, the captain replied that such a possibility did not occur to him. His interpretation of what he heard was based upon the direction from which the sound came (SM 155–56, 159). Furthermore, if in fact, it was a backing signal which motivated the SINCLAIR to maneuver, those aboard her should also have assumed that a third vessel was present since the Rule provides that the backing signal is to be given when vessels are in sight of each other. 33 U.S.C. § 213 (1958), 33 U.S.C.A. § 213. Although the captain's testimony is somewhat unclear as to whether he thought the signals were addressed to his vessel or not, it is clear that he was galvanized into action by the direction from which he thought the signals came (SM 155–59).

more honored in the breach than in the observance, merely means that people are usually willing to take chances rather than submit to the galling necessity of poking about in a fog * * *." Anglo-Saxon Petroleum Co., Limited, of London, England v. United States, 222 F. 2d 75, 78 (2d Cir.), rehearing denied, 224 F.2d 86 (2d Cir. 1955). In addition to her statutory fault of excessive speed, the SINCLAIR is also chargeable with the fault of failing to navigate with caution.

 Where the fault of the moving vessel is clear, as it is here, she is solely liable for colliding with an anchored vessel, unless she can show with equal clarity that the accident was caused by the fault of the anchored vessel. The Oregon, supra; The Newburgh, 130 F. 321 (2d Cir. 1904); see The Virginia Ehrman, 97 U.S. 309, 315, 24 L.Ed. 890 (1878). Since the faults of the SINCLAIR are "sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of. the other vessel." The City of New York, supra, 147 U.S. at 85, 13 S.Ct. at 216. She must prove a fault on the part of the FASSIO, and that the fault contributed to the collision. But even if this be proved, the best that SINCLAIR can hope for is a decree for divided damages, for her own navigation was hardly free from fault. Nevertheless, with what little grace can be mustered under the circumstances, the SINCLAIR attempts to persuade the court that the FASSIO should be held for the entire damage. The SINCLAIR charges that the FASSIO was at fault in sounding an improper whistle signal, in failing to ring the fog bell, in failing to maintain a proper lookout and in failing to slack the anchor chain.

Before deciding whether the signal made by the FASSIO was improper, it is necessary to resolve the conflict over what signal she did sound. The SINCLAIR urges that it was a three blast backing signal. In discussing the faults of the SINCLAIR, I accepted, for purposes of argument, that the FASSIO sounded three short blasts and that this was what the SINCLAIR heard. I find as a fact, however, that the signal sounded by the FASSIO was the "R" signal, one short, one long, and one short blast. Counsel for the SINCLAIR, in arguing that the signal was three short blasts, urges that it is improbable that Captain Zustovich counted off the seconds in sounding the signal. I find that he did. The court observed the captain when he gave his testimony at the trial and was impressed with his truthfulness. It is entirely credible that he counted off the seconds in sounding the signal and that he remembered the time when he sounded the first "R" signal. The details surrounding this collision have been seared indelibly in his recollection. His testimony was corroborated by that of Officer Branca, whom I found also to be a credible witness.

The question of whether the FASSIO was at fault in sounding the "R" signal can be broken down into two parts: (1) Was the master justified in sounding any supplementary signal and (2) was his choice of the "R" signal improper?

 As a properly anchored and privileged vessel, the FASSIO was subject only to the specific requirement that the fog bell be rung. 33 U.S.C. § 191(d), (1958) 33 U.S.C.A. § 191(d); see The Oregon, supra. But had she done nothing more, her conduct certainly would have been questioned under the General Prudential Rule, 33 U.S.C. § 221 (1958), 33 U.S.C.A. § 221.[4] Where a vessel apprehends danger and does nothing within her power to avoid or miti-

---

4. Article 29 of the Inland Rules, 33 U.S.C. § 221, (1958) 33 U.S.C.A. § 221 provides:
"Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

gate a collision, she is hardly discharging her duty to take the precautions required by the special circumstances of the case. See Griffin, Collision § 157 at 371 (1949); cf., Chesapeake & O. R. Co. v. Cleveland Tankers, Inc., 121 F.Supp. 830, 834 (E.D.Mich.1954). The master of the FASSIO, based upon his radar observations and the prevailing conditions of fog, apprehended danger. He considered the speed of the SINCLAIR, her position on the extreme easterly edge of the channel, the set of the current, the possibility that the SINCLAIR would anchor as he had done, and that the distance within which his fog bell could be heard would not provide adequate warning to the other vessel at the speed she was travelling. See Petition of Socony Vacuum Transp. Co., supra, 93 F. Supp. at 734, 736. The master's prudent decision to sound a supplementary signal was not a fault.

The only fog signal provided for by the Inland Rules for vessels at anchor is the fog bell. 33 U.S.C. § 191(d) (1958), 33 U.S.C.A. § 191(d). The International Rules do provide, however, for a supplementary signal of the character sounded by the FASSIO. 33 U.S.C. § 145m(c)(iv) (1958), 33 U.S.C.A. § 145 m(c)(iv). And The Great Lakes Rules, by amendment in 1948, now require the "R" signal for vessels at anchor in fog. 62 Stat. 82 (1948), 33 U.S.C. § 271(e) (1958), 33 U.S.C.A. § 271(e). Although no case has been cited, nor has one been found, which specifically approved the "R" signal in inland waters, the use of supplementary signals has been sanctioned when danger of collision is apprehended. See The City of Alexandria, supra, 31 F. at 430; The Merchant Prince, 10 Prob.Div. 139 (1892); United States v. Woodbury, 175 F.2d 854, 861–62 (1st Cir. 1949). Petition of Clyde-Mallory Line, A 110–104, S.D.N.Y., May 20, 1937 (summary reported at 1937 Am.

Mar.Cas. 837); cf. Union Shipping & Trading Co. v. United States, 127 F.2d 771, 773 (2d Cir. 1942). Both expert witnesses testified that supplementary signals are commonly used when prudent seamanship requires. Under the circumstances prevailing on the day of collision it cannot be said that the master of the FASSIO was at fault for sounding the "R" signal. It is a signal known to mariners and was known to the captain and pilot of the SINCLAIR. The signal provided, to those who would hear and heed it, the information that there was a vessel at anchor in the fog.

Counsel for the SINCLAIR argues that the sounding of the "R" signal was an unauthorized departure from the Inland Rules. 33 U.S.C. § 212 (1958), 33 U.S.C.A. § 212.[5] The cases cited do not bear out this contention. The Pennsylvania, 86 U.S. 125, 22 L.Ed. 148 (1873) did involve a misleading signal. But the fault was found because the barque did not give the required statutory signal and substituted an equivalent which was in fact misleading. In The G. K. Mellon, 30 F.2d 238 (2d Cir. 1929), a tug was held at fault for failing to sound regulation fog signals and her last minute alarm was held not to excuse her. No mention of supplementary signals is made. Similarly, in The Southway, 2 F.2d 1009 (E.D.N.Y. 1924), the employment of a substitute instead of the required signal was condemned. And in The Minnesota, 189 F. 706 (S.D.N.Y.1911) use of the horn instead of the prescribed whistle was found to be a fault. Counsel's quotations from Farwell, The Rules of the Nautical Road 173 (1954) and Knight, Modern Seamanship 377–78 (1960) similarly offer him little support. They do nothing more than describe the differences between the Inland and International Rules. Although Knight recognizes the availability of a danger signal

---

5. Article 27 of the Inland Rules, 33 U.S.C. § 212, (1958) 33 U.S.C.A. § 212, provides:
 "In obeying and construing these rules due regard shall be had to all dangers of navigation and collision, and to any special circumstances which may render a departure from the above rules necessary in order to avoid immediate danger."

as a supplementary signal, neither treatise indicates a specific prohibition of the "R" signal under the circumstances of this case.

Assuming that the sounding of the supplementary signal was a departure from the Rules, it was one that was justified by the special circumstances here prevailing. 33 U.S.C. § 212 (1958), 33 U.S.C.A. § 212. SINCLAIR argues that any departure from the Rules is likely to cause confusion and increase the likelihood of collision. The case cited in support, Afran Transport Co. v. The Bergechief, supra, held it a fault to give a port to port passing signal in fog when not in sight of the other vessel. "Such a *breach* of the rules is bound to cause confusion and increase the probability of a collision." 274 F.2d at 472 (emphasis added). Although departures from the Rules to give supplementary signals may not be approved as a general practice, there may be circumstances where it becomes necessary to do so under the General Prudential Rule. 33 U.S.C. § 221 (1958), 33 U.S.C.A. § 221; Union Shipping & Trading Co. v. United States, supra, 127 F.2d at 773; United States v. Woodbury, supra, 175 F.2d at 861–62. Moreover, Article 27 of the Inland Rules specifically recognizes departures for special circumstances. 33 U.S.C. § 212 (1958), 33 U.S.C.A. § 212.

SINCLAIR contends further that if any supplementary signal was to be sounded, the FASSIO should have sounded a danger signal instead of the "R" signal.[6] The expert witnesses concurred that supplementary signals are regularly sounded and that whether or not to do so is a question of judgment. SINCLAIR now seeks to impugn the judgment of Captain Zustovich. Even if the master of the FASSIO is chargeable with an error of judgment, which I find he is not, it cannot be raised to the level of a fault on the facts of this case. "Where the master of a vessel, placed in a situation of peril not of his making, has, acting within the bounds of

reason, done that which at the time and under the stress and strain of the moment seemed to be the best thing to do, he will not be charged with fault by second guessing after the event." Green v. Crow, supra, 243 F.2d at 403; The Maggie J. Smith, 123 U.S. 349, 355–56, 8 S.Ct. 159, 31 L.Ed. 175 (1887); The Queen Elizabeth, 122 F. 406, 409 (2d Cir.), cert. denied, 190 U.S. 560, 23 S.Ct. 855, 47 L.Ed. 1184 (1903). His actions are "not to be too freely criticised by those who navigating from the witness chair after the event may think that another course might have been better." The Gulfstar, 136 F.2d 461, 465 (3d Cir. 1943).

Even giving the SINCLAIR the best of all the arguments concerning the propriety of the supplementary signal would not require the FASSIO to share the damages. Sounding this supplementary signal here would be, at best, a passive or minor fault, and would come within the major-minor fault principle. See The City of New York, supra, 147 U.S. 72, 13 S.Ct. at 216, 37 L.Ed. 84; The Great Republic, 23 Wall. 20, 35, 90 U.S. 20, 35, 23 L.Ed. 55 (1874); The Europe, 190 F. 475 (9th Cir. 1911); The Lord O'Neill, 66 F. 77 (4th Cir. 1895); Gilmore & Black Admiralty, 402–04 (1957). The gross faults of the SINCLAIR so flagrantly and heavily outweigh any passive fault on the part of the FASSIO that in this case it is particularly apt to say that "the interests of justice are best served by condemning the more culpable vessel completely." Compania De Maderas De Caibarien, S.A. v. The Queenston Heights, 220 F.2d 120, 123 (5th Cir.), cert. denied, 350 U.S. 824, 76 S.Ct. 52, 100 L.Ed. 736 (1955).

After the close of the evidence, SINCLAIR obtained leave to amend the pre-trial order to reinstate certain claims of fault against the FASSIO. The claimed fault of the FASSIO in failing to ring her fog bell is unsupported by the evidence. I find that she did

---

6. Yet the master of the SINCLAIR admitted that if he heard an "R" signal he would treat it the same way he would a danger signal.

ring her bell as required by the Rules, 33 U.S.C. § 191(d) (1958), 33 U.S.C.A. § 191(d). I also find that the charge that the FASSIO failed to maintain a proper lookout is unsupported by the evidence. SINCLAIR further contends that the master was at fault for failure to recall the pilot to the bridge when he apprehended danger. No such duty or requirement has been shown by SINCLAIR. At the trial, counsel indicated that this was a question of law. He has failed to support this position. The case cited, Union Shipping & Trading Co. v. United States, 127 F.2d 771, 795 (2d Cir.1942), does not bear out his contention. I find no fault on the part of the master of the FASSIO in this respect.

SINCLAIR's final argument in attempting to shift the responsibility for this collision onto the FASSIO is that the latter was at fault in failing to slack her anchor chain. The record is almost entirely barren of any mention of slackening the anchor chain. And in any event the SINCLAIR has failed to show that there was any impropriety in failing to slack chain under the circumstances of this collision. The anchored vessel, though privileged, has the same duty as any other vessel to avoid collisions when it is within her power to do so. Any duty to pay out more anchor must depend upon the circumstances; i. e., whether the vessel has the time and opportunity to do so. See The Europe, supra, 190 F. at 479; Griffin, Collision § 157 (1949). The cases cited by SINCLAIR are not apposite. The Ciudad de Reus, 185 F. 391 (2d Cir.1911), involved vessels at anchor which were dragging on their chains. The statements there made do not bear on this case. In The Ailsa, 76 F. 868, 874 (S.D.N.Y.1896), aff'd 86 F. 475 (2d Cir.,), cert. denied, La Bourgagne, 172 U.S. 646, 19 S.Ct. 883, 43 L.Ed. 1180 (1898), the court found that the anchored vessel should have slacked chain when the oncoming vessel was sighted visually, and the court was persuaded that there was sufficient time for the collision to have been thereby averted. That is not the case at bar, for here there were but seconds from sighting to collision. The SINCLAIR has not demonstrated, and I am not persuaded, that the collision would have been avoided had the FASSIO slacked chain. The better view is that stated in P. Dougherty Co. v. United States, 168 F.2d 464, 466 (2d Cir.1948), where the court refused to hold that the anchored vessel "when in extremis was under any duty to try such a doubtful expedient." Thus, I find no fault with the FASSIO for failing to slack her chain.

Under the foregoing analysis of this case, it was not necessary to resolve all the disputed questions of timing raised by the parties. For even accepting the timing of the FASSIO's signals as urged by the SINCLAIR, I have found SINCLAIR at fault. However, in order that the record be complete, the court will indicate its findings on the question of timing. I find that the timing of the signals as urged by the FASSIO is correct. The witnesses for the FASSIO were wholly credible and their testimony is accepted. Moreover, it is corroborated by the Engine Bell Book of the SINCLAIR.

Counsel agree that the Bell Book constitutes the best evidence with respect to the SINCLAIR's engine maneuvers and the times at which they were made. That exhibit shows that the order to place the engines on maneuvering speed was received at 9:35; that the first stop order was given at 9:47; that full astern was ordered at 9:47½; and that two emergency full astern orders were given at 9:48. Although it is apparent that the clocks on the SINCLAIR and the clocks on the FASSIO were showing different times, counsel for the SINCLAIR now attempts to adopt the 9:50 collision time of the FASSIO in order to make the SINCLAIR's engine room record conform to SINCLAIR's theory of the accident. But on the SINCLAIR, the collision was recorded by her officers as occurring at 9:47.

The credible testimony is that when SINCLAIR was one mile from the FAS-

SIO, Captain Zustovich sounded the "R" signal. This occurred six minutes before the collision. Three minutes later, a second signal was sounded. This is corroborated by the Bell Book which shows no engine order until 9:47 SINCLAIR time, seconds before the collision. Moreover, if the SINCLAIR timing were analyzed in detail, it would be seen that it was physically impossible for the vessel to traverse the distance from Buoy 42, the point where SINCLAIR claims to have reacted to the FASSIO's signal, in the span of time claimed. What was in the minds of the captain and pilot of the SINCLAIR which motivated them to maneuver as they did will remain forever in the realm of conjecture. But what is clear is that the SINCLAIR was careless and reckless and is solely at fault for the collision with the ANGELA FASSIO.

 The final issue for disposition concerns the grounding of the E. W. SINCLAIR. After the collision, the SINCLAIR disengaged by going astern. She dragged along the FASSIO's anchor chain and the FASSIO facilitated her movement by letting out some more anchor chain. When the SINCLAIR was clear she was facing west, toward the channel. She kept backing to the east and then passed up the port side of the FASSIO. After drifting and maneuvering for awhile, the SINCLAIR eventually anchored about 1,000 yards east of the channel and a mile north of where the FASSIO still lay at anchor. There was no obstruction which prevented the SINCLAIR from maneuvering closer to the deeper water near the easterly edge of the channel. The pilot and master were merely concerned with getting clear of the FASSIO. Rather than maneuver toward the channel they chose the shallower water, preferring to go aground rather than risk encountering any channel traffic. The SINCLAIR was subsequently found to have gone aground.

 The SINCLAIR claims that the grounding resulted from the collision and that the FASSIO is liable for the damage sustained by the SINCLAIR. The FASSIO claims that the grounding resulted from intervening acts of negligent navigation on the part of the SINCLAIR. She claims that the SINCLAIR should have anchored in deeper water near the channel and that the errors of judgment made in choosing an anchorage in shoal water were unconnected with the slight damage to her fo'c'sle which she sustained in the collision. Since the SINCLAIR has been found solely at fault for the collision and the FASSIO has been found to be without fault, I do not see how the FASSIO can be charged with responsibility for the grounding unless she did something subsequent to the collision which caused the SINCLAIR to go aground. No such argument has been made. Thus, even if the grounding resulted from the collision, the FASSIO cannot be held at fault for the grounding since she was not responsible for the collision. Indeed, whatever damage was sustained by the SINCLAIR due to her grounding was proximately caused by her own fault.

One final matter requires comment. After the trial of this action had been concluded and post-trial briefs submitted, counsel for the SINCLAIR moved to reopen the case to take the testimony of the oiler of the SINCLAIR who was on duty on the day of the collision. Oral argument was heard on the motion and a transcript was prepared as part of the record in this case. The motion to reopen was denied after argument.

 Generally, under the admiralty practice, after a hearing is concluded, the case may be reopened and further proof received upon a proper showing and in furtherance of justice. See De Souza v. Dollar S. S. Lines, 292 F. 490 (W.D.Wash.1923). A reopening, however, will not be granted to admit further evidence where there is no showing that competent evidence will be produced. See The Bainbridge, 199 F. 404 (9th Cir.1912). Nor will it be permitted where the moving party might have offered the evidence in his main case but failed to do so. See The Persiana, 158 F. 912 (S.D.N.Y.1907). Oversight is

not a ground for reopening a case. See The Francis Wright, 9 Fed.Cas. p. 692 (No. 5044) (S.D.N.Y.1874), aff'd., 105 U.S. 381, 26 L.Ed. 1100 (1881). In order for a case to be reopened for the introduction of new evidence, the evidence must in fact be newly discovered, and must be material to the issues in the case. See Taylor v. Crain, 125 F.Supp. 314 (W.D.Pa.1954), *reversed on other grounds*, 224 F.2d 237 (3d Cir.1955). "After a case has been closed, whether or not it should be reopened is within the sound discretion of the trial court. Philadelphia & Trenton R. R. Co. v. Stimpson, 14 Pet. 448, 39 U.S. 448, 10 L.Ed. 535. Though it may be permitted in a proper case, it has been called a 'pernicious practice'. Missouri Pac. Ry. Co. v. Oleson, 8 Cir., 213 F. 329. Where a party has not shown diligence in procuring a witness, the reopening of the case may be denied. Cincinnati, N. O. & T. Ry. Co. v. Cox, 6 Cir., 143 F. 110." Reconstruction Finance Corp. v. Commercial Union, 123 F.Supp. 748, 750 (S.D.N.Y.1954). The standards for the exercise of the court's discretion are the same under the Admiralty Rules and the Civil Rules. See Neville v. American Barge Line Co., 218 F.2d 190 (3d Cir. 1954); see generally 6 Moore, Federal Practice, 3722–28 (2d ed.).

 The motion could have been denied simply on the face of the moving papers. Neither counsel's argument nor his offer of proof presented anything to persuade the court to exercise its discretion. It was not claimed that the prospective witness would give newly discovered evidence. His testimony would have been cumulative at best. Counsel had ample opportunity to avail himself of this witness, either in person or by deposition. I found not even a scintilla of merit to this application and accordingly it was denied.

In conclusion, it is clear that the E. W. SINCLAIR was guilty of two statutory faults. Her speed of 10 knots through the water (11½ knots over the ground) was excessive and a violation of Article 16 of the Inland Rules. 33 U.S.C. § 192 (1958), 33 U.S.C.A. § 192. Her navigation after hearing whistle signals forward of her beam from a vessel whose position was not ascertained was not cautious and constitutes a further violation of Article 16. The SINCLAIR has failed to rebut the presumption of fault which arises out of a collision between a moving vessel and an anchored vessel. The Oregon, supra. Moreover, having twice violated a statutory rule, the E. W. SINCLAIR had the burden of proving not only that her faults did not cause the collision, but that they could not have contributed to causing the collision. The Pennsylvania, supra. She has not sustained this burden. Indeed, her excessive speed and improper maneuvers were the direct cause of the collision and the damage suffered by the ANGELA FASSIO. At best, the SINCLAIR has succeeded in doing no more than raise a slight doubt as to the management of the FASSIO. See The City of New York, supra. I conclude that the FASSIO was not at fault. While the sounding of a supplementary signal by the FASSIO in addition to the prescribed fog bell did not succeed in avoiding the collision, it did not contribute to the collision. Sounding the supplementary signal, although not provided for specifically in the Inland Rules, is not prohibited by the Rules and was not a violation of the Rules. It was a proper exercise of prudent seamanship under the special circumstances prevailing. 33 U.S.C. §§ 212, 221 (1958), 33 U.S.C.A. §§ 212, 221.

Respondent, Sinclair Refining Company is responsible for the damages sustained by the ANGELA FASSIO. Libelant, Villain & Fassio, is not responsible for the damages sustained by the SINCLAIR, either as a result of the collision or the grounding. Villain and Fassio is entitled to a decree dismissing the libel of Sinclair Refining Company with costs. Villain & Fassio is also entitled to a decree on its libel against Sinclair Refining Company for the amount of its damages with interest and costs.

The subject matter of this action and the parties thereto are all within the admiralty jurisdiction of this court. The foregoing opinion shall constitute the Findings of Fact and Conclusions of Law in accordance with Admiralty Rule 46½, 28 U.S.C.A.

Let a decree be entered accordingly.